[Civ. No. 69350. Second Dist., Div. Two. Oct. 12, 1983.]

NEIL LEONARD BARBER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[Civ. No. 69351. Second Dist., Div. Two. Oct. 12, 1983.]

ROBERT JOSEPH NEJDL, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

1008

COUNSEL

Maxwell S. Keith, George A. Oakes, Munns, Kofford, Hoffman, Hunt & Throckmorton, Harland W. Braun and William J. Gargaro, Jr., for Petitioners.

No appearance for Respondent.

Robert H. Philibosian, District Attorney, Harry B. Sondheim, Richard W. Gerry, Nikola M. Mikulicich and Hyatt E. Seligman, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**COMPTON, J.**—In these consolidated proceedings we consider petitions for writs of prohibition pursuant to Penal Code section 999a filed by two medical doctors who are charged in a complaint, now pending before a magistrate in the Los Angeles Judicial District, with the crimes of murder and conspiracy to commit murder—both felonies.

At the close of a lengthy preliminary hearing the magistrate ordered the complaint dismissed. On motion of the People, pursuant to Penal Code section 871.5, the superior court ordered the magistrate to reinstate the complaint. These proceedings followed. We issued the alternative writ, calendared the matter and heard oral argument. We have concluded that the peremptory writ should issue.

Deceased Clarence Herbert underwent surgery for closure of an ileostomy. Petitioner Robert Nejdl, M.D., was Mr. Herbert's surgeon and petitioner Neil Barber, M.D., was his attending internist. Shortly after the successful completion of the surgery, and while in the recovery room, Mr. Herbert suffered a cardiorespiratory arrest. He was revived by a team of physicians and nurses and immediately placed on life support equipment.

Within the following three days, it was determined that Mr. Herbert was in a deeply comatose state from which he was not likely to recover. Tests and examinations performed by several physicians, including petitioners herein, each specializing in relevant fields of medicine indicated that Mr. Herbert had suffered severe brain damage, leaving him in a vegetative state, which was likely to be permanent.

At that time petitioners informed Mr. Herbert's family of their opinion as to his condition and chances for recovery. While there is some dispute as to the precise terminology used by the doctors, it is clear that they communicated to the family that the prognosis for recovery was extremely poor. At that point, the family convened and drafted a written request to the hospital personnel stating that they wanted "all machines taken off that are sustaining life" (*sic*). As a result, petitioners, either directly or as a result of orders given by them, caused the respirator and other life-sustaining equipment to be removed. Mr. Herbert continued to breathe without the equipment but showed no signs of improvement. The family remained at his bedside and requested of the nursing staff that Mr. Herbert not be disturbed. They even objected to certain routine procedures followed by hospital personnel in caring for comatose patients.

After two more days had elapsed, petitioners, after consulting with the family, ordered removal of the intravenous tubes which provided hydration and nourishment. From that point until his death, Mr. Herbert received nursing care which preserved his dignity and provided a clean and hygienic environment.

The precise issue for determination by this court is whether the evidence presented before the magistrate was sufficient to support his determination that petitioners should not be held to answer to the charges of murder (Pen. Code, § 187) and conspiracy to commit murder (Pen. Code, § 182).

As we will later discuss, this issue must be determined against a background of legal and moral considerations which are of fairly recent vintage and which as a result have not, in our opinion, been adequately addressed by the Legislature.

In *Self* v. *General Motors Corp.* (1974) 42 Cal.App.3d 1, at page 7 [116 Cal.Rptr. 575], Justice Fleming observed that "prosecution of a lawsuit is a poor way to design a motor vehicle." By analogy it appears to us that a murder prosecution is a poor way to design an ethical and moral code for doctors who are faced with decisions concerning the use of costly and extraordinary "life support" equipment.

Murder is the *unlawful* killing of a human being, . . . with malice aforethought." (Pen. Code, § 187, italics added.) Malice may be express or implied. It is express when there is an intent *unlawfully* to take any life. It is implied when the circumstances show an abandoned and malignant heart. (Pen. Code, § 188.)

The magistrate who heard the evidence made written findings of fact and concluded that (1) petitioners did not "kill" the deceased since their conduct was not the proximate cause of death—the proximate cause (the principal cause listed on the death certificate) being diffuse encephalomalacia, secondary to anoxia, (2) the petitioners' conduct under the circumstances, being the result of good faith, ethical and sound medical judgment, was not unlawful, and (3) the petitioners' state of mind did not amount to "malice."

The superior court judge, as he was required to do under the statute before ordering reinstatement of the complaint, concluded *as a matter of law* that petitioners' conduct, however well motivated, and however ethical or sound in the eyes of the medical profession, was, under California law, "unlawful." This conclusion was reached despite his determination that the magistrate's findings were supported by substantial evidence.

The judge opined that, since everyone, sooner or later will die, homicide is simply the shortening of life by some measurable period of time and inasmuch as the petitioners' intentional conduct, which shortened Mr. Herbert's life, was not authorized by law, it constituted murder.

■ Of course the term homicide simply connotes the death of an individual at the hands of another. In any homicide the end result is the same—the death of a human being. Whether or not a homicide is punishable as a crime in the first instance, and the degree of punishment which is imposed in the case of a criminal homicide depends upon the mental culpability of the person causing the death.

■ The term "malice" is an amorphous and ill-defined state of mind which the law considers sufficiently culpable to make an unlawful killing murder rather than some lesser form of criminal homicide such as manslaughter. While the law is settled that motive is irrelevant to a determination of whether a killing amounts to murder, the lack of precision in defining malice often makes it difficult to disentangle motive from a determination of what constitutes malice.

For the purposes of this decision, however, we accept the superior court judge's analysis that if petitioners unlawfully and intentionally killed Mr. Herbert, the malice could be presumed regardless of their motive.

The use of the term "unlawful" in defining a criminal homicide is generally to distinguish a criminal homicide from those homicides which society has determined to be "justifiable" or "excusable." Euthanasia, of course, is neither justifiable nor excusable in California.

In California, homicide is excusable, inter alia, "when committed by *accident* and *misfortune*, . . . in doing any . . . lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." (Pen. Code, § 195, italics added.) Since petitioners conduct, whether lawful or unlawful, was intentional, if it resulted in the shortening of Mr. Herbert's life, it was not a matter of *accident* and *misfortune*.

Since "justifiable" homicide, by a person other than a peace officer, in California is limited essentially to cases of self-defense and defense of others (Pen. Code, § 197), that concept has no application here.

Obviously the above mentioned concepts evolved and were codified at a time well prior to the development of the modern medical technology which is involved here, which technology has caused our society to rethink its concepts of what constitutes "life" and "death."

This gap between the statutory law and recent medical developments has resulted in the instant prosecution and its attendant legal dispute. That dispute in order to be resolved within the framework of existing criminal law must be narrowed to a determination of whether petitioners' conduct was unlawful. That determination, as indicated above, must be made on the basis of principles other than those limited ones set forth in Penal Code sections 195 and 197.

The California Legislature has dealt partially with some of the problems that have arisen as a result of modern developments.

Historically, death has been defined in terms of cessation of heart and respiratory function. (*Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 656, 79 A.L.R.3d 205]; U.S. cert. den. 429 U.S. 922 [50 L.Ed.2d 289, 97 S.Ct. 319]; *Eichner* v. *Dillon* (1980) 73 App.Div.2d 431 [426 N.Y.S.2d 517, 531]; *State* v. *Johnson* (1977) 60 Ohio App.2d 45 [14 Ohio Ops.3d 24, 395 N.E.2d 368, 371].) Health and Safety Code section 7180, subdivision (a)(2)[1] now provides for an alternative definition in terms of irreversible cessation of all brain function.

This is a clear recognition of the fact that the real seat of "life" is brain function rather than mere metabolic processes which result from respiration and circulation.

Of course it is conceded by all that at the time petitioners terminated further treatment, Mr. Herbert was not "dead" by either statutory or historical standards since there was still some minimal brain activity. If Mr. Herbert had in fact been "brain dead," this prosecution could not have been instituted because one cannot be charged with killing another person who is already dead.

We deal here with the physician's responsibility in a case of a patient who, though not "brain dead," faces an indefinite vegetative existence without any of the higher cognitive brain functions. As one court stated the

---

[1]Health and Safety Code section 7180 provides: "(a) An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards. (b) This article shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it. (c) This article may be cited as the Uniform Determination of Death Act."

Since the death with which we are here concerned occurred in 1981, former Health and Safety Code section 7180, adopted in 1974, was the statute then in effect. That statute provided in part: "A person shall be pronounced dead if it is determined by a physician that the person has suffered a total and irreversible cessation of brain function." For present purposes any distinctions between the current and former statutes are immaterial.

issue: "Now, however, we are on the threshold of new terrain—the penumbra where death begins but life, in some form, continues. We have been led to it by the medical miracles which now compel us to distinguish between 'death,' as we have known it, and death in which the body lives in some fashion but the brain (or a significant part of it) does not." (*Severns v. Wilmington Medical Center, Inc.* (Del. 1980) 421 A.2d 1334, 1344.)

Because of the current gap between technology and law, physicians and families of these unfortunate victims are called upon to make intensely painful and personal decisions regarding their care without clearly defined legal guidelines.

This case, arising as it does in the context of the criminal law, belies the belief expressed by many that such decisions would not likely be subjects of criminal prosecution. (*Matter of Spring* (1980) 380 Mass. 629 [405 N.E.2d 115, 121]; President's Com. for Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment, Rep. on Ethical, Medical and Legal Issues in Treatment Decisions, (Mar. 1983) ch. 1, pp. 32-39 [hereinafter cited as President's Commission].) To our knowledge, however, this case is the first instance in which the issue has been presented in the context of a criminal prosecution.

Of course, the only long-term solution to this problem is necessarily legislative in nature. It is that body which must address the moral, social, ethical, medical and legal issues raised by cases such as the one at bench. Manifestly, this court cannot attempt to rewrite the statutory definition of death or set forth guidelines covering all possible future cases. Due to legislative inaction in this area, however, we are forced to evaluate petitioners' conduct within the context of the woefully inadequate framework of the criminal law.

■■■ At this juncture we observe that California has adopted the Natural Death Act which permits an adult individual to execute, in advance, a directive for the withholding or withdrawing of life sustaining procedures in the event that he or she later suffers a terminal condition. (Health & Saf. Code, § 7188.)

The superior court judge relied heavily on the fact that the deceased had not previously executed a written directive pursuant to Health and Safety Code section 7188 and he viewed the family's request as a nullity.

In adopting the Natural Death Act (Health & Saf. Code, § 7185 et seq.), the Legislature has gone part way, but only part way, in dealing with this

troublesome issue. The lack of generalized public awareness of the statutory scheme and the typically human characteristics of procrastination and reluctance to contemplate the need for such arrangements however makes this a tool which will all too often go unused by those who might desire it.

Furthermore, as commentators have noted, the act functions as intended for only a very limited number of patients. If the directive is executed by a person *prior* to his having been diagnosed as terminally ill, it is not binding on the physician (Health & Saf. Code, § 7191, subd. (c)). In addition, the procedural requirements (especially the requirement in Health & Saf. Code, § 7191, subd. (d) that the patient wait 14 days after diagnosis of terminal illness) are so cumbersome that it is unlikely that any but a small number of highly educated and motivated patients will be able to effectuate their desires. (Winslade, *Bioethics* (1978) 1 L.A. Law. 16; Greenbaum, *Current Standards of Practice in Medicine: The Medical, Judicial and Legislative Roles* (1978) 7 Western St.U. L.Rev. 3, 20.)

Practical utility aside, the act, according to its own terms, does not purport to be the exclusive means by which such decisions can be made.

Health and Safety Code section 7193 provides: "Nothing in this chapter shall impair or supersede any legal right or legal responsibility which any person may have to effect the withholding or withdrawal of life-sustaining procedures in any lawful manner. In such respect the provisions of this chapter are cumulative."

We thus turn to an analysis of the superior court's determination that petitioners' conduct was "unlawful" as a matter of law.

■ In this state a clearly recognized legal right to control one's own medical treatment predated the Natural Death Act. A long line of cases, approved by the Supreme Court in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1], have held that where a doctor performs treatment in the absence of an informed consent, there is an actionable battery. The obvious corollary to this principle is that a competent adult patient has the legal right to refuse medical treatment.

■ It is clear from the legislative findings and declaration provided in Health and Safety Code section 7186, that the Legislature recognized such a right to control one's medical treatment, especially in circumstances such as presented here.

"The Legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care,

including the decision to have life-sustaining procedures withheld or withdrawn in instances of a terminal condition.

"The Legislature further finds that modern medical technology has made possible the artificial prolongation of human life beyond natural limits.

"The Legislature further finds that, in the interest of protecting individual autonomy, such prolongation of life for persons with a terminal condition may cause loss of patient dignity and unnecessary pain and suffering, while providing nothing medically necessary or beneficial to the patient."

Therefore we conclude that Health and Safety Code section 7188 does not represent the exclusive basis for terminating life-support equipment in this state. Nor is a diagnosis of "brain dead" a condition precedent to the cessation of such treatment.

█ As a predicate to our analysis of whether the petitioners' conduct amounted to an "unlawful killing," we conclude that the cessation of "heroic" life support measures is not an affirmative act but rather a withdrawal or omission of further treatment.

Even though these life support devices are, to a degree, "self-propelled," each pulsation of the respirator or each drop of fluid introduced into the patient's body by intravenous feeding devices is comparable to a manually administered injection or item of medication. Hence "disconnecting" of the mechanical devices is comparable to withholding the manually administered injection or medication.

Further, we view the use of an intravenous administration of nourishment and fluid, under the circumstances, as being the same as the use of the respirator or other form of life support equipment.

█ The prosecution would have us draw a distinction between the use of mechanical breathing devices such as respirators and mechanical feeding devices such as intravenous tubes. The distinction urged seems to be based more on the emotional symbolism of providing food and water to those incapable of providing for themselves rather than on any rational difference in cases such as the one at bench. (President's Commission, *supra*, ch. 5, p. 192, fn. 52.)

*Medical* nutrition and hydration may not always provide net benefits to patients. Medical procedures to provide nutrition and hydration are more similar to other medical procedures than to typical human ways of providing

nutrition and hydration. Their benefits and burdens ought to be evaluated in the same manner as any other medical procedure.

The authority cited by the People for the holding that a murder charge may be supported by the failure to feed an infant is easily distinguishable. (*People* v. *Burden* (1977) 72 Cal.App.3d 603 [140 Cal.Rptr. 282].) The parent in that case had a clear duty to feed an otherwise healthy child. (Pen. Code, § 270.) As we will discuss, *infra,* the duty of a physician under the circumstances of the case at bench is markedly different.

In the final analysis, since we view petitioners' conduct as that of omission rather than affirmative action, the resolution of this case turns on whether petitioners had a duty to continue to provide life sustaining treatment.

■ There is no criminal liability for failure to act unless there is a legal duty to act. (1 Witkin, Cal. Crimes, § 67, p. 71.) Thus the critical issue becomes one of determining the duties owed by a physician to a patient who has been reliably diagnosed as in a comatose state from which any meaningful recovery of cognitive brain function is exceedingly unlikely.

■ "A physician, surgeon or dentist must exercise that degree of skill or care *usual* in the profession in the place in which he practices; i.e., the standard is set by doctors of good standing practicing in that locality. [Citations.] It follows that 'Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient. . . .' [Citation.]" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 514, p. 2778.)

In examining this issue we must keep in mind that the life-sustaining technology involved in this case is not traditional treatment in that it is not being used to directly cure or even address the pathological condition. It merely sustains biological functions in order to gain time to permit other processes to address the pathology.

The question presented by this modern technology is, once undertaken, at what point does it cease to perform its intended function and who should have the authority to decide that any further prolongation of the dying process is of no benefit to either the patient or his family?

■ A physician has no duty to continue treatment, once it has proved to be ineffective. Although there may be a duty to provide life-sustaining machinery in the *immediate* aftermath of a cardio-respiratory arrest, there

is no duty to continue its use once it has become futile in the opinion of qualified medical personnel.

"A physician is authorized under the standards of medical practice to discontinue a form of therapy which in his medical judgment is useless. . . . If the treating physicians have determined that continued use of a respirator is useless, then they may decide to discontinue it without fear of civil or criminal liability. By useless is meant that the continued use of the therapy cannot and does not improve the prognosis for recovery." (Horan, *Euthanasia and Brain Death: Ethical and Legal Considerations* (1978) 315 Annals N.Y.Acad.Sci. 363, 367, as quoted in President's Commission, *supra,* ch. 5, p. 191, fn. 50.)

Of course, the difficult determinations that must be made under these principles is the point at which further treatment will be of no reasonable benefit to the patient, who should have the power to make that decision and who should have the authority to direct termination of treatment.

No precise guidelines as to when or how these decisions should be made can be provided by this court since this determination is essentially a medical one to be made at a time and on the basis of facts which will be unique to each case. If specific procedural rules are to be adopted in this area in order to protect the public interest, they must necessarily come from that body most suited for the collection of data and the reaching of a consensus—the Legislature. However, we would be derelict in our duties if we did not provide some general guidelines for future conduct in the absence of such legislation.

"[T]here must be a way to free physicians, in the pursuit of their healing vocation, from possible contamination by self-interest or self-protection concerns which would inhibit their independent medical judgments for the well-being of their dying patients. We would hope that this opinion might be serviceable to some degree in ameliorating the professional problems under discussion." (*Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, at p. 668, 79 A.L.R.3d 205].)

 Several authorities have discussed the issue of which life-sustaining procedures must be used and for how long their use must be maintained in terms of "ordinary" and "extraordinary" means of treatment. (President's Commission, *supra,* ch. 2, pp. 82-89; *Matter of Quinlan, supra,* 355 A.2d at p. 668; *Superintendent of Belchertown* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417, 424].) The use of these terms begs the question. A more rational approach involves the determination of whether the proposed

treatment is proportionate or disproportionate in terms of the benefits to be gained versus the burdens caused.

Under this approach, proportionate treatment is that which, in the view of the patient, has at least a reasonable chance of providing benefits to the patient, which benefits outweigh the burdens attendant to the treatment. Thus, even if a proposed course of treatment might be extremely painful or intrusive, it would still be proportionate treatment if the prognosis was for complete cure or significant improvement in the patient's condition. On the other hand, a treatment course which is only minimally painful or intrusive may nonetheless be considered disproportionate to the potential benefits if the prognosis is virtually hopeless for any significant improvement in condition. (See generally President's Commission, ch. 2, pp. 82-90.)

Several authorities have struggled with this issue and some consensus has been reached on the theory if not the terminology.

"[O]ne would have to think that the use of the same respirator or like support could be considered 'ordinary' in the context of the possibly curable patient but 'extraordinary' in the context of the forced sustaining by cardio-respiratory processes of an irreversibly doomed patient." (*Matter of Quinlan, supra,* 355 A.2d at p. 668.)

Thus, the determination as to whether the burdens of treatment are worth enduring for any individual patient depends on facts unique to each case, namely, how long the treatment is likely to extend life and under what conditions. "[S]o long as a mere biological existence is not considered the *only* value, patients may want to take the nature of that additional life into account as well." (President's Commission, ch. 2, at p. 88.)

Of course the patient's interests and desires are the key ingredients of the decision-making process. When dealing with patients for whom the possibility of full recovery is virtually nonexistent, and who are incapable of expressing their desires, there is also something of a consensus on the standard to be applied.

"[T]he focal point of decision should be the prognosis as to the reasonable possibility of return to cognitive and sapient life, as distinguished from the forced continuance of that biological vegetative existence . . . ." (*Matter of Quinlan, supra,* 355 A.2d at p. 669.)

" 'Prolongation of life,' . . . does not mean a mere suspension of the act of dying, but contemplates, at the very least, a remission of symptoms enabling a return towards a normal, functioning, integrated existence."

(*Matter of Dinnerstein* (1978) 6 Mass.App. 466 [380 N.E.2d 134, at p. 138].)

 The evidence presented at the preliminary hearing supports the conclusion that petitioners reasonably concluded that Mr. Herbert had virtually no chance of recovering his cognitive or motor functions. The most optimistic prognosis provided by any of the testifying experts was that the patient had an excellent chance of "recovery." However, recovery was defined in terms of a spectrum running from a persistent vegetative state to full recovery. A persistent vegetative state was described as that state in which the patient would have no contact with the environment but parts of the brain would continue to live. The doctor who was of course approaching the case after the fact and from a hindsight view, was unable to predict where on this continuum Mr. Herbert was likely to end up. Several studies on which the expert relied, however, indicated that the chances for unimpaired or full recovery were miniscule. The results of these studies coincided with the diagnoses of the physicians who had actually examined and dealt with the patient before his demise.

Given the general standards for determining when there is a duty to provide medical treatment of debatable value, the question still remains as to who should make these vital decisions. Clearly, the medical diagnoses and prognoses must be determined by the treating and consulting physicians under the generally accepted standards of medical practice in the community and, whenever possible, the patient himself should then be the ultimate decisionmaker.

When the patient, however, is incapable of deciding for himself, because of his medical condition or for other reasons, there is no clear authority on the issue of who and under what procedure is to make the final decision.

It seems clear, in the instant case, that if the family had insisted on continued treatment, petitioners would have acceded to that request. The family's decision to the contrary was, as noted, ignored by the superior court as being a legal nullity.

In support of that conclusion the People argue that only duly appointed legal guardians have the authority to act on behalf of another. While guardianship proceedings might be used in this context, we are not aware of any authority *requiring* such procedure. In the case at bench, petitioners consulted with and relied on the decisions of the immediate family, which included the patient's wife and several of his children. No formal guardianship proceedings were instituted.

In the absence of legislation requiring such legal proceedings, we cannot say that failure to institute such proceedings made petitioners' conduct unlawful. Whether such proceedings are to be required in the future is again a question for the Legislature to decide.

The authorities are in agreement that any surrogate, court appointed or otherwise, ought to be guided in his or her decisions first by his knowledge of the patient's own desires and feelings, to the extent that they were expressed before the patient became incompetent. (President's Commission, ch. 4, p. 132; *Superintendent of Belchertown* v. *Saikewicz, supra,* 370 N.E.2d p. 431.)

If it is not possible to ascertain the choice the patient would have made, the surrogate ought to be guided in his decision by the patient's best interests. Under this standard, such factors as the relief of suffering, the preservation or restoration of functioning and the quality as well as the extent of life sustained may be considered. Finally, since most people are concerned about the well-being of their loved ones, the surrogate may take into account the impact of the decision on those people closest to the patient. (President's Commission, ch. 4, pp. 134-135.)

There was evidence that Mr. Herbert had, prior to his incapacitation, expressed to his wife his feeling that he would not want to be kept alive by machines or "become another Karen Ann Quinlan." The family made its decision together (the directive to the hospital was signed by the wife and eight of his children) after consultation with the doctors.[2]

Under the circumstances of this case, the wife was the proper person to act as a surrogate for the patient with the authority to decide issues regarding further treatment, and would have so qualified had judicial approval been sought. There is no evidence that there was any disagreement among the wife and children. Nor was there any evidence that they were motivated in their decision by anything other than love and concern for the dignity of their husband and father.

Furthermore, in the absence of legislative guidance, we find no legal requirement that prior judicial approval is necessary before any decision to withdraw treatment can be made.

---

[2]The People urge that petitioners were obligated to consult Mr. Herbert's sister-in-law rather than his wife and children for this most important decision. Despite the fact that Mr. Herbert apparently entered the name of his sister-in-law on a hospital form (the purpose of which was unclear from the evidence), his wife and children were the most obviously appropriate surrogates in this case. They were the people who would be most affected by the decision and were in the best position to know Mr. Herbert's own feelings and desire. In addition, there was clear evidence that they were concerned for his comfort and welfare and some or all of them were present at the hospital nearly around the clock.

Although there is not complete agreement among the courts that have addressed the issue in the civil context, we agree with those which have held that requiring judicial intervention in all cases is unnecessary and may be unwise. (*Matter of Quinlan, supra,* 355 A.2d 647; *Matter of Storar* (1981) 438 N.Y.S.2d 266 [420 N.E.2d 64], U.S. cert. den., 454 U.S. 858 [70 L.Ed.2d 153, 102 S.Ct. 309].)

The *Quinlan* court stated at 355 A.2d at page 669: "We consider that a practice of applying to a court to confirm such decisions would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be impossibly cumbersome. . . . This is not to say that in the case of an otherwise justiciable controversy access to the courts would be foreclosed; we speak rather of a general practice and procedure."

In summary we conclude that the petitioners' omission to continue treatment under the circumstances, though intentional and with knowledge that the patient would die, was not an unlawful failure to perform a legal duty. In view of our decision on that issue, it becomes unnecessary to deal with the further issue of whether petitioners' conduct was in fact the proximate cause of Mr. Herbert's ultimate death.

The evidence amply supports the magistrate's conclusion. The superior court erred in determining that as a matter of law the evidence required the magistrate to hold petitioners to answer.

Let a peremptory writ of prohibition issue to restrain the Superior Court of Los Angeles County from taking any further action in this matter other than to vacate its order reinstating the complaint and enter a new and different order denying the People's motion under Penal Code section 871.5.

Roth, P. J., and Beach, J., concurred.