[No. C003631. Third Dist. Jan. 2, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
VERNON ODELL ADAMS, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to rule 976.1 of the California Rules of Court, the Reporter of Decisions is directed to publish all portions of this opinion *except* parts II, III and IV.

COUNSEL

Richard J. Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Michael J. Weinberger and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SCOTLAND, J.—After a jury convicted defendant of murder in the first degree (Pen. Code, §§ 187, 189; all further references are to this code unless otherwise specified), the trial court modified the verdict to second degree murder pursuant to its authority under section 1181, subdivision 6. Defendant also was found to have used a firearm in the commission of the murder. (§ 12022.5.) The trial court sentenced defendant to the indeterminate term of 15-years-to-life and "stayed" the 2-year sentence imposed for the firearm use enhancement. Both defendant and the People have appealed.

In the published portion of this opinion, we consider whether the defendant's constitutional right to confront and cross-examine his accuser was violated by admission of the victim's dying declarations made after he chose not to prolong his life through artificial life support. We reject defendant's contention that the declarations should have been excluded because the prosecution did not use due diligence to keep the victim alive until the preliminary examination. Since the victim made a competent decision to refuse life-support measures, the prosecution had no authority, and consequently no duty, to ensure the victim's presence at the preliminary examination by compelling him to be placed on life-support. We also find no merit in defendant's assertion that, because the victim chose to hasten his death by refusing life support, his statements constituted "suicide declarations" which were inherently untrustworthy. The decision to forego artificial life support is not tantamount to committing suicide, and statements made in contemplation of death after a decision to refuse life support are admissible as dying declarations.

In the unpublished portion of this opinion, we reject both defendant's claim that he received ineffective assistance of counsel and the People's argument that the trial court abused its discretion in modifying the verdict. Although not raised by either party, we also address the trial court's error in "staying" rather than "striking" the section 12022.5 sentence enhancement. (§ 1170.1, subd. (h).)

FACTS

Defendant and the victim, Clarence Eugene Hughes, Jr., were friends. While defendant and his wife were driving home on the evening of November 16, 1986, they saw Hughes walking, pulled over, and invited him to their house for a few drinks. After they arrived, defendant's wife went to the residence of a neighbor, Charlene Flood.

While his wife was gone, defendant shot Hughes once with a shotgun, hitting him on the side of the neck. Defendant then called Flood, told her to summon an ambulance, and stated, "I just shot Gene Hughes."

After calling 911, Flood went to defendant's home and observed Hughes sitting on the couch with a "big, gaping hole in his neck." Defendant, a paraplegic, was on the other side of the room sitting in his wheelchair facing Hughes. A coffee table was in front of the sofa between Hughes and defendant, and an open shotgun was lying on the floor near the front door.

When officers arrived, defendant told them he shot in self-defense when Hughes "came up" to defendant and threatened him. In defendant's words, "He [Hughes] just fucking spun on me, man."

Although the shotgun blast struck Hughes's spine near the base of the neck, shattered two vertebrae and severed his spinal cord, Hughes did not die until five days after the shooting.

At trial, the prosecution introduced statements Hughes made two days before his death to Detective Gary Coffey. During his initial statement, Hughes described defendant as his closest friend and indicated that the shooting was accidental. Then, after speaking with his sister, Hughes asked to talk with Detective Coffey again. This time, Hughes said that defendant "meant to kill" him. Hughes explained he had not been truthful during the first interview because he and defendant had been best friends; however, he was persuaded to tell the truth after speaking with his sister. Hughes described the incident as follows: Upon arriving home, defendant excused himself to go to the bathroom. When he returned, he was holding a shotgun. Defendant told his wife to leave, then stated he was going to shoot Hughes because Hughes had cursed at defendant's wife during a telephone call several days earlier. Unsure whether defendant really would shoot, Hughes simply looked away. At that point, the shotgun went off. The autopsy findings were consistent with Hughes's description of the shooting.

Testifying at trial, defendant maintained that he shot Hughes in self-defense. According to defendant, his wife left him alone with Hughes because she had to go to a neighbor's house to borrow tape defendant needed to affix the external catheter he wears. Thereafter, Hughes became angry about a "wrong" that defendant supposedly had done to Hughes's father and began to threaten defendant. Hughes then started "coming up" off the couch. Defendant's dog lunged at the screaming Hughes, who knocked the dog across the coffee table. Fearful that Hughes was going to kill him, defendant rolled backward in his wheelchair into the hallway, picked up a shotgun which was propped up against the heater, said "Don't Gene" and, without aiming, shot Hughes.

There were no witnesses to the shooting other than defendant and Hughes. In support of his self-defense claim, defendant called seven witnesses who testified about Hughes's violent character. Defendant also introduced evidence of Hughes's prior misdemeanor convictions for an assault with a deadly weapon and battery.

DISCUSSION

I

Over defendant's objection, the trial court granted the prosecutor's motion *in limine* to admit Hughes's statements as dying declarations under

Evidence Code section 1242. The evidence pertinent to the ruling is as follows: After he was shot, Hughes was taken to a hospital where it was discovered that the shotgun blast inflicted by defendant had left Hughes permanently paralyzed from the neck down, severely impairing his ability to breathe. Following surgery, Hughes was advised by his attending physician that, in the event of respiratory arrest, he would have to be placed on a ventilator in order to remain alive. Although it was possible Hughes might live several years on a ventilator, his surgeon believed the respirator would prolong Hughes's life for only a "matter of days or weeks." According to the surgeon, Hughes was "doomed to die . . . ." Hooking up a ventilator by inserting a breathing tube through Hughes's mouth and down his windpipe merely would have "stretch[ed] out the misery or suffering." Hughes directed his physician not to place him on life support, preferring to die rather than live sustained by a respirator.

The day after the shooting, Hughes was visited by the pastor of his church. When Hughes stated, "I'm not going to make it", they spoke of spiritual matters and prayed together. During a later visit on November 19, 1986, Hughes "was having a hard time breathing, he was gasping for breath." Again, Hughes told his pastor, "I'm not going to make it." Soon thereafter, Detective Coffey interviewed Hughes. Before relating the events which occurred on the night of the shooting, Hughes acknowledged that his physician had told him he probably would not live without the help of a respirator. Detective Coffey asked, "Do you realize or do you think you're going to die because of this wound that you received?" Hughes responded, "Now? Yeah." Hughes died two days later, prior to the preliminary examination and before defendant had an opportunity to question him about the statements he made to Detective Coffey.

On appeal, defendant raises two novel arguments in contending that his right to confront and cross-examine his accuser was violated by the admission of Hughes's statements.

A. *The State Had No Power, and Consequently No Duty, to Keep the Dying Witness Alive by Compelling Him to Be Placed on a Life-Support Respirator Until After the Preliminary Examination.*

 Defendant first asserts that the statements should have been excluded because the state "permitted Mr. Hughes to die" before giving defendant an opportunity to cross-examine him. In essence, defendant argues that (1) knowing of Hughes's intention to "hasten" his death, the state "had a duty to ensure that Mr. Hughes was kept on a respirator so he would not die of suffocation until after the preliminary hearing"; (2) in breaching this duty by allowing Hughes to refuse life support and die soon thereafter, the

state did not use due diligence to prevent Hughes from becoming absent as a witness; and (3) by failing to make a good faith effort to secure Hughes's presence at the preliminary hearing, the state created the necessity (unavailability) for admitting Hughes's statements as dying declarations and thereby violated defendant's right to confrontation.

In the superior court, defendant did not rely on this specific ground of objection to the admission of Hughes's statements. Accordingly, he has failed to preserve the issue for appeal. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 80 [241 Cal.Rptr. 594, 744 P.2d 1127]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 766 [239 Cal.Rptr. 82, 739 P.2d 1250]; *In re Michael L.* (1985) 39 Cal.3d 81, 88 [216 Cal.Rptr. 140, 702 P.2d 222].) Nevertheless, because defendant raises the fallback argument that his trial counsel was ineffective from failing to so object, we address the substance of defendant's contention. Finding no merit to the position asserted, as discussed below, we reject defendant's claim of ineffective assistance of counsel. Obviously, trial counsel cannot be deemed incompetent for failing to advance a meritless contention. (*People* v. *Constancio* (1974) 42 Cal.App.3d 533, 546 [116 Cal.Rptr. 910].)

The prosecution has no obligation to make a good faith effort to obtain a witness's presence at trial if the state has no power to do so. "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), 'good faith' demands nothing of the prosecution." (*Ohio* v. *Roberts* (1980) 448 U.S. 56, 74 [65 L.Ed.2d 597, 613, 100 S.Ct. 2531].)

Here, the question posed is whether the prosecution had the authority to override the witness's refusal to be placed on a life support respirator. If not, the state had no power, and thus no obligation, to prolong Hughes's life until the preliminary examination. (448 U.S. 56, 74 [65 L.Ed.2d 597, 613].) This question requires a balancing of the witness's right to refuse treatment and the defendant's right to confrontation.

■ " '[A] person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment.' (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr 505, 502 P.2d 1].) It follows that such a patient has the right to refuse *any* medical treatment, even that which may save or prolong life. [Citations.]" (*Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127, 1137 [225 Cal.Rptr. 297]; see also *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 206 [245 Cal.Rptr. 840]; *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186, 195 [209 Cal.Rptr. 220]; *Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006, 1015 [195 Cal.Rptr. 484, 47 A.L.R.4th 1].)

This fundamental right to refuse medical treatment is guaranteed by the right of privacy set forth in article I, section 1 of the California Constitution. (*Bartling* v. *Superior Court, supra,* 163 Cal.App.3d at p. 195.)

The California Legislature also has recognized that, as a matter of public policy, "adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances of a terminal condition." (Health & Saf. Code, § 7186.) ■ In fact, the Legislature has set forth procedures whereby an adult can execute written directives for withholding or withdrawal of life-sustaining procedures. (Health & Saf. Code, § 7185 et seq.; Civ. Code, § 2500 et seq.)[1]

The issue of a competent adult's right to refuse life-support measures typically arises in cases in which a hospital has refused to comply with such instructions from one of its patients. In those cases, courts have held that the individual's right to die rather than live by artificial means outweighs competing state interests in preserving the patient's life, preventing suicide, protecting innocent third parties (such as minor children who would be left without a parent if treatment does not proceed), and maintaining the ethical integrity of the medical profession. (*Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d at pp. 1142-1146; *Bartling* v. *Superior Court, supra,* 163 Cal.App.3d at pp. 195-198.)

■ Defendant has asserted a different competing interest: his constitutional right to confront his accuser. Yet, the United States Supreme Court has recognized that competing interests may warrant dispensing with the right of confrontation and that the right of an accused to cross-examine a witness must occasionally give way to considerations of public policy. (*Ohio* v. *Roberts, supra,* 448 U.S. at p. 64 [65 L.Ed.2d at p. 606].)

The right to reject life-sustaining procedures is such a fundamental constitutional right and matter of public policy that it outweighs a defendant's right to confront his accuser, just as it prevails over other significant competing interests noted above. The right involves privacy and one's personal dignity. Forcing a competent adult to prolong his or her life on artificial life-support in order to promote an accused's right to confrontation certainly shocks the conscience more than putting a tube into the stomach of a criminal defendant to recover swallowed narcotics—a practice strongly disapproved of in *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed. 183, 72

---

[1] Hughes did not execute a written directive to withhold life-support systems. However, a written directive is not the exclusive mechanism for exercising the fundamental right to determine one's own medical treatment. (*Conservatorship of Drabick, supra,* 200 Cal.App.3d at pp. 215-216.)

S.Ct. 205, 25 A.L.R.2d 1396]. While it may be convenient to insist on artificially continuing a witness's life so the person will be available for cross-examination, "it is quite another matter to do so at the patient's sole expense and against his competent will, thus inflicting . . . physical torture on his body [and emotional torture on his mind] . . . . Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and invades his right to self-determine." (*Satz* v. *Perlmutter* (Fla.Dist.Ct.App. 1978) 362 So.2d 160, 164, affd. 379 So.2d 359.)

Defendant seeks to discount the intrusion on Hughes's right to privacy and personal dignity by arguing that life-support was needed only for four days until the scheduled preliminary examination. We cannot accept defendant's premise. The fact that life-support would be necessary for but a short time, even coupled with a defendant's competing right to confront and cross-examine his accuser, does not justify violating an individual's right to refuse life-support measures. If this right must be balanced against the number of days in which one desires to override the patient's wish, it would lose its value and meaning. (*Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d at pp. 1142-1143.) As the Legislature has noted, *any* prolongation of life for persons with a terminal condition "may cause loss of patient dignity and unnecessary pain and suffering . . . ." (Health & Saf. Code, § 7186.) Simply stated, in the absence of a more compelling public policy, the right to refuse life-support measures is impermissibly violated if an individual is forced to survive one or 100 days beyond the point he or she rejects such treatment.

Accordingly, the state had no power, and consequently no duty, to ensure Hughes's presence at the preliminary examination by compelling him to be placed on a life-support respirator. (Cf. *People* v. *Mitchell* (1982) 132 Cal.App.3d 389, 399 [183 Cal.Rptr. 166] [the state owes no duty to a defendant in a criminal proceeding to ensure that a judicial hearing takes place before a life-support system is removed from a witness].) It follows, then, that the prosecution did not violate defendant's right to confrontation by failing to secure Hughes's appearance at this preliminary hearing.

B. *The Fact That the Statements Were Made After the Witness Chose to Die Rather Than Accept Life-support Treatment Does Not Render the Declarations Untrustworthy.*

■ Defendant next asserts that Hughes's statements should have been excluded because they were "suicide declarations" rather than dying declarations. Relying on the premise that Hughes committed the "evil" act of suicide by refusing life-support, defendant argues that a "person who would ask to die as quickly as possible is not a person whose frame of mind can be

said to produce trustworthy and reliable declarations." Thus, he contends that "[s]tatements made prior to self-induced, premature death are not admissible as dying declarations because they do not have similar guarantees of trustworthiness or adequate 'indicia of reliability'. . . ." We disagree.

Contrary to defendant's assertion, making the decision to forego living an existence sustained by artificial means is not tantamount to committing suicide. (*Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d at p. 1144 [a patient's "decision to allow nature to take its course is not equivalent to an election to commit suicide . . . ."]; *Bartling* v. *Superior Court, supra,* 163 Cal.App.3d at p. 196.) In fact, the Legislature has expressly provided that the "withholding or withdrawal of life-sustaining procedures from a qualified patient . . . shall not, *for any purpose,* constitute a suicide." (Health & Saf. Code, § 7192, subd. (a), italics added.) Nor, as defendant suggests, is it an immoral, indecent act. "It certainly is not illegal or immoral to prefer natural, albeit sooner, death than a drugged life attached to a mechanical device." (179 Cal.App.3d at p. 1145.)

Likewise, we reject defendant's suggestion that the decision to reject life-support is the product of a state of mind which is unlikely to produce trustworthy declarations. Choosing not to prolong one's life by artificial means is perhaps the most courageous and rational decision a person must ever make.

We find no reason to distinguish Hughes's dying declarations from other such declarations simply because they were made after he decided not to artificially prolong his life. The fact the statements were made after the witness chose to die rather than accept life-support treatment does not render them untrustworthy. The crucial element in determining whether a declaration is sufficiently trustworthy for admission under the dying declaration exception to the hearsay rule is the declarant's sense of impending death—not the precipitating cause of death. (See 5 Wigmore, Evidence (Chadbourn rev. 1974) §§ 1438-1444, pp. 289-303; 1 Jefferson, Evidence Benchbook (2d ed. 1982) § 7.1, p. 280.) "The sense of impending death is presumed to remove all temptation to falsehood." (*Mattox* v. *U.S.* (1895) 156 U.S. 237, 244 [39 L.Ed. 409, 411].)

Here, the evidence supports the trial court's finding that the declarations were trustworthy because Hughes believed death was imminent when he made the statements. ■ ■■ ■ ■ Accordingly, the admission of

Hughes's dying declarations did not violate defendant's right to confrontation.[2]

### II-IV*

. . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The trial court is directed to amend the abstract of judgment to conform to the direction in part IV of this opinion and to forward a copy of the amended abstract of judgment to the California Department of Corrections. In all other respects, the judgment is affirmed.

Sims, Acting P. J., and Marler, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 19, 1990.

---

[2] In his reply brief, defendant makes an offhand suggestion that Detective Coffey "manufactured" the dying declarations by having Hughes respond to "leading questions about his impending death." We reject this contention because, without good cause, it was not raised until the reply brief. "Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission. Hence, the rule is that *points raised in the reply brief for the first time will not be considered,* unless good reason is shown for failure to present them before. [Citations.]" (9 Witkin, Cal. Procedure (3d ed. 1985) § 496, p. 484.)

Moreover, defendant failed to preserve this issue because he did not raise it in the trial court. (*People v. Miranda, supra,* 44 Cal.3d at p. 80; *People v. Ghent, supra,* 43 Cal.3d at p. 766; *In re Michael L., supra,* 39 Cal.3d at p. 88.)

Even if we were to address the issue, we would reject defendant's argument for it fails on the merits. "The fact that a [dying] declaration was made in response to questions, even leading questions, does not affect its admissibility." (2 Wharton's Criminal Evidence (14th ed. 1986) § 327, p. 367.)

*See footnote, *ante,* page 1431.