[No. B055657. Second Dist., Div. Six. Jan. 29, 1992.]

THOMAS DONALDSON et al., Plaintiffs and Appellants, v.
DANIEL E. LUNGREN, as Attorney General, etc., et al., Defendants and
Respondents.

## COUNSEL

Garfield, Tepper, Ashworth & Epstein, Christopher Ashworth, David B. Epstein and Jacqueline Misho for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Linda C. Johnson, Kristofer Jorstad, Deputy Attorneys General, David Nawi, County Counsel, and Stephen D. Underwood, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**GILBERT, J.**—Plaintiff Thomas Donaldson wishes to die in order to live. He suffers from an incurable brain disease. He wishes to commit suicide with the assistance of plaintiff Carlos Mondragon so that his body may be cryogenically preserved. It is Donaldson's hope that sometime in the future, when a cure for his disease is found, his body may be brought back to life.

He and Mondragon appeal a judgment dismissing their action for declaratory and injunctive relief. Despite our sympathy for Donaldson, we must affirm and hold he has no constitutional right to either premortem cryogenic suspension or an assisted suicide. We also decide Mondragon has no constitutional right to aid, advise or encourage Donaldson's suicide.

## FACTS

Donaldson and Carlos Mondragon brought an action for declaratory and injunctive relief against the state Attorney General, the Santa Barbara District Attorney, and the Santa Barbara County Coroner. Plaintiffs' first amended complaint seeks a declaration that Donaldson has a constitutional right to premortem cryogenic suspension of his body and the assistance of others in achieving that state. The first amended complaint also seeks an injunction against criminal prosecution of Mondragon and others for participating in the premortem cryogenic suspension and an injunction against the coroner performing an autopsy on Donaldson's body after death. Plaintiffs allege the following:

Plaintiff Thomas Donaldson, a mathematician and computer software scientist, suffers from a malignant brain tumor, diagnosed by physicians as a grade 2 astrocytoma. The astrocytoma, a "space occupying lesion," is inoperable and continues to grow and invade brain tissue. The tumor has caused Donaldson weakness, speech impediments and seizures. Ultimately, continued growth of the tumor will result in Donaldson's persistent vegetative state and death. Physicians have predicted his probable death by August 1993, five years from initial diagnosis.

Donaldson desires to be cryogenically suspended, premortem, with the assistance of Mondragon and others. This procedure would freeze Donaldson's body to be later reanimated when curative treatment exists for his brain cancer. Following cryogenic suspension, Donaldson will suffer irreversible cessation of circulatory and respiratory function and irreversible cessation of all brain function.

He will be dead according to the definition of death set forth in Health and Safety Code section 7180. That section provides: "(a) An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. . . ."

Donaldson seeks a judicial declaration that he has a constitutional right to cryogenic suspension premortem with the assistance of others. Alternatively, he asserts he will end his life by a lethal dose of drugs. Mondragon will "advise and encourage" Donaldson through suicide "to minimize the time between his legal death and the onset of the cryonic suspension process."

Recognizing that Mondragon will be committing a homicide, or alternatively, aiding and advising a suicide, Donaldson and Mondragon seek an

injunction protecting Mondragon from criminal prosecution. In order not to destroy his chance of reanimation, they also seek a court order to prevent the county coroner from examining Donaldson's remains. Donaldson and Mondragon base their action upon asserted constitutional rights of privacy and free expression.

Defendants demurred to plaintiffs' first amended complaint, contending Donaldson had no constitutional right to an assisted suicide and could not consent to his murder. Defendants also raised procedural challenges to plaintiffs' action. The trial judge ruled plaintiffs failed to state a cause of action, sustained the demurrer, and dismissed the action. Plaintiffs' appeal followed. On appeal they contend: 1) Donaldson has a constitutional right to premortem cryogenic suspension, and 2) Donaldson has a constitutional right to receive and Mondragon has a constitutional right to give advice and encouragement concerning Donaldson's suicide.

## DISCUSSION

### I.

Donaldson wishes to achieve cryogenic suspension of his body, premortem, before his relentlessly advancing brain tumor destroys the quality and purpose of his life, reduces him to a vegetative state, and makes futile his hope for reanimation.

Whatever Donaldson's motivations are for dying, however, he argues his right to privacy and self-determination are paramount to any state interest in maintaining life. He reasons the state has no logical, secular motive to demand his continued existence, given his medical condition and prognosis. Therefore, there should be no balancing of interests where the state has only an abstract interest in preserving life in general as opposed to Donaldson's specific and compelling interest in ending his particular life.

Donaldson rests his contentions upon judicial decisions declaring the right of a competent patient, his guardian, or surrogate to refuse medical treatment or procedures that sustain life. (*Cruzan* v. *Director, Mo. Health Dept.* (1990) 497 U.S. 261 [111 L.Ed.2d 224, 110 S.Ct. 2841]; *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297]; *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186 [209 Cal.Rptr. 220]; *Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006 [195 Cal.Rptr. 484, 47 A.L.R.4th 1].)

A person has a constitutionally protected interest in refusing unwanted medical treatment or procedures. (*Cruzan* v. *Director, Mo. Health*

*Dept., supra*, 497 U.S. 261, __ [111 L.Ed.2d 224, 241]; *People* v. *Adams* (1990) 216 Cal.App.3d 1431, 1438 [265 Cal.Rptr. 568]; *Conservatorship of Drabick* (1988) 200 Cal.App.3d 185, 206, fn. 20 [245 Cal.Rptr. 840]; *Bouvia* v. *Superior Court, supra*, 179 Cal.App.3d 1127, 1141.) This constitutionally secured right derives from a liberty interest found in the Fourteenth Amendment to the United States Constitution (*Cruzan, supra*, 497 U.S. at p. __, fn. 7 [111 L.Ed.2d at p. 242]) and, in California, from the right of privacy in article I, section 1 of the California Constitution. (*Adams, supra*, 216 Cal.App.3d at p. 1438; *Bouvia, supra*, 179 Cal.App.3d at p. 1137.) The right of patient autonomy has been described as "the ultimate exercise of one's right to privacy." (*Bouvia, supra*, 179 Cal.App.3d at p. 1144.)

This right to medical self-determination also derives from the legal doctrine of informed consent to medical treatment. (*Cruzan* v. *Director, Mo. Health Dept., supra*, 497 U.S. at p. __ [111 L.Ed.2d 224, 236]; *Barber* v. *Superior Court, supra*, 147 Cal.App.3d 1006, 1015.) A logical corollary of the doctrine is that a patient possesses the right not to consent and to refuse treatment. (*Ibid.*)

Whether asserting rights resting upon the United States or California Constitution or the decisional law of informed consent, a patient may refuse treatment even though withholding of treatment creates a life-threatening situation. (*Bouvia* v. *Superior Court, supra*, 179 Cal.App.3d 1127, 1137 —28-year-old quadriplegic, cerebral palsy victim may assert her constitutional right to refuse nasogastric hydration and nourishment.) Moreover, the right to refuse treatment or life-sustaining measures is not limited to those who are terminally ill. (*Id.*, at p. 1138—patient had life expectancy of 15 to 20 additional years; *Bartling* v. *Superior Court, supra*, 163 Cal.App.3d 186, 192-193—patient was seriously ill and ventilator-dependent but not "terminal.")

 To determine whether Donaldson has suffered a violation of his constitutional rights, we must balance his interests against any relevant state interests. (*Cruzan* v. *Director, Mo. Health Dept., supra*, 497 U.S. 261, __ [111 L.Ed.2d 224, 242]; *People* v. *Adams, supra*, 216 Cal.App.3d 1431, 1438.) Pertinent state interests include preserving human life, preventing suicide, protecting innocent third parties such as children, and maintaining the ethical integrity of the medical profession. (*Adams, supra*, at p. 1438; Alexander, *Death by Directive* (1988) 28 Santa Clara L.Rev. 67, 78 (hereafter *Death by Directive*).) The state may also decline to assess the quality of a particular human life and assert an unqualified general interest in the preservation of human life to be balanced against the individual's constitutional rights. (*Cruzan, supra*, 497 U.S. at p. __ [111 L.Ed.2d at p. 244].)

Decisions regarding the right to refuse life-sustaining treatment, including hydration and nourishment, distinguish between artificial life support in the face of inevitable death and self-infliction of deadly harm (suicide). (*Bartling* v. *Superior Court, supra,* 163 Cal.App.3d 186, 196.) Likewise, decisions hold a physician incurs no criminal liability by terminating life support measures when a patient chooses to abandon such treatment. (*Barber* v. *Superior Court, supra,* 147 Cal.App.3d 1006, 1016, 1022; *Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 670-671, 79 A.L.R.3d 205].) The rationale of these decisions is that natural death from underlying illness is merely forestalled by life support measures. (*Conservatorship of Drabick, supra,* 200 Cal.App.3d 185, 196; *Bartling* v. *Superior Court, supra,* 163 Cal.App.3d 186, 196.)

Donaldson acknowledges these decisions concern patients in persistent vegetative states (*Cruzan* v. *Director, Mo. Health Dept., supra,* 497 U.S. 261 [111 L.Ed.2d 224]; *Barber* v. *Superior Court, supra,* 147 Cal.App.3d 1006) or patients otherwise dependent upon life-sustaining measures (*Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d 1127; *Bartling* v. *Superior Court, supra,* 163 Cal.App.3d 186), but argues a refusal of further medical treatment is a legal fiction for suicide: "As is often true in times of social transition, case law has created fictions to avoid affronting previously accepted norms. [Fn. omitted.] In life support termination, there is a fiction of medical determinism. Patients are seen as passive victims of their illness. They do not choose to die; death overtakes them. Their physicians do nothing to help them die. Death overwhelms them, too." (*Death by Directive, supra,* 28 Santa Clara L.Rev. at p. 82.)

Donaldson argues that the doctor who disconnects the support system is taking affirmative action that in fact causes the death of the patient. He points out that even if the doctor assists the patient to die by doing nothing, he or she is actively participating in ending the patient's life. " 'Not doing anything is doing something. It is a decision to act every bit as much as deciding for any other deed. If I decide not to eat or drink anymore, knowing what the consequence will be, I have committed suicide as surely as if I had used a gas oven.' J. FLETCHER, HUMANHOOD: ESSAYS IN BIOMEDICAL ETHICS 157 (1979)." (Note, *Suicidal Competence and the Patient's Right to Refuse Lifesaving Treatment* (1987) 75 Cal.L.Rev. 707, 740, fn. 213.)

There may be an apparent similarity between the patient and doctor, and Donaldson and Mondragon, but in fact there is a significant difference. The patient, for example, who is being kept alive by a life-support system has taken a detour that usually postpones an immediate encounter with death. In short, the medical treatment has prolonged life and prevented death from

overtaking the patient. Stopping the treatment allows the delayed meeting with death to take place.

Donaldson is asking that we sanction something quite different. Here there are no life-prolonging measures to be discontinued. Instead, a third person will simply kill Donaldson and hasten the encounter with death. No statute or judicial opinion countenances Donaldson's decision to consent to be murdered or to commit suicide with the assistance of others. (*Van Holden* v. *Chapman* (1982) 87 A.D.2d 66 [450 N.Y.S.2d 623, 627]—"essential dissimilarity" between right to decline medical treatment and any right to end one's life.)

 Donaldson, however, may take his own life. He makes a persuasive argument that his specific interest in ending his life is more compelling than the state's abstract interest in preserving life in general. No state interest is compromised by allowing Donaldson to experience a dignified death rather than an excruciatingly painful life.

Nevertheless, even if we were to characterize Donaldson's taking his own life as the exercise of a fundamental right, it does not follow that he may implement the right in the manner he wishes here. It is one thing to take one's own life, but quite another to allow a third person assisting in that suicide to be immune from investigation by the coroner or law enforcement agencies.

In such a case, the state has a legitimate competing interest in protecting society against abuses. This interest is more significant than merely the abstract interest in preserving life no matter what the quality of that life is. Instead, it is the interest of the state to maintain social order through enforcement of the criminal law and to protect the lives of those who wish to live no matter what their circumstances. This interest overrides any interest Donaldson possesses in ending his life through the assistance of a third person in violation of the state's penal laws. We cannot expand the nature of Donaldson's right of privacy to provide a protective shield for third persons who end his life.

Donaldson argues that his right to die is like a citizen's right to vote. An invalid, for example, may need the assistance of a third person to get to the polling booth. Donaldson argues that in similar fashion his claimed right to take his life carries with it the right to assistance in exercising that right.

In the example of the invalid voter, the state has no competing interest to prevent assistance. Quite the contrary, the state's interest is to encourage its

citizens to vote. In the case of assisted suicides, however, the state has an important interest to ensure that people are not influenced to kill themselves. The state's interest must prevail over the individual because of the difficulty, if not the impossibility, of evaluating the motives of the assister or determining the presence of undue influence.

To this, Donaldson argues constitutional rights do not depend on there being a fail-safe scheme, nor may they be deferred because of the difficulty in devising a procedure to implement them. We agree with the general proposition that the difficulty in effecting a solution to a legal problem is not sufficient grounds for a court to deny relief. However cumbersome, it is conceivable to devise a judicial procedure to supervise Donaldson's assisted death.

We do not embark on such an enterprise because we hold Donaldson has no constitutional right to a state-assisted death. ■ Moreover, the court may not enjoin public officers from performing official acts that they are required by law to perform. (See Civ. Code, § 3423 and Code Civ. Proc., § 526, which provide that injunctions may not be granted to prevent officers of the law acting for the benefit of the public pursuant to statute; see also *Manchel* v. *County of Los Angeles* (1966) 245 Cal.App.2d 501, 505-506 [54 Cal.Rptr. 53], disallowing injunctions to stay criminal proceedings.) The coroner is required to inquire into deaths involving suicide or homicide (Gov. Code, § 27491) and, to carry out his or her inquiry, may take custody of the remains and examine the body of a homicide or suicide victim. (See Gov. Code, § 27491.2; Health & Saf. Code, § 7102.)

It is unfortunate for Donaldson that the courts cannot always accommodate the special needs of an individual. We realize that time is critical to Donaldson, but the legal and philosophical problems posed by his predicament are a legislative matter rather than a judicial one.

## II.

■ Donaldson also argues that at the very least he has a constitutional right to receive advice and encouragement concerning his suicide. Penal Code section 401 provides: "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony." Donaldson asserts this section unconstitutionally interferes with his right to privacy. He relies upon this concurring opinion in *Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d 1127, 1147: "This state and the medical profession, instead of frustrating [Bouvia's] desire, should be attempting to relieve her suffering by permitting and in fact assisting her to die with ease and dignity. . . . [¶]

. . . [The right to die] should . . . include the ability to enlist assistance from others, including the medical profession, in making death as painless and quick as possible." He also relies upon scholarly thought proposing that suicide assistance be decriminalized under certain circumstances. (Smith, *All's Well That Ends Well: Toward a Policy of Assisted Rational Suicide or Merely Enlightened Self-Determination?* (1989) 22 U.C. Davis L.Rev. 275 (hereafter *All's Well*); note, *Criminal Liability for Assisting Suicide* (1986) 86 Colum. L.Rev. 348 (hereafter *Assisting Suicide*).)

■ Suicide or attempted suicide is not a crime under the criminal statutes of California or any state. (*In re Joseph G.* (1983) 34 Cal.3d 429, 433 [194 Cal.Rptr. 163, 667 P.2d 1176, 40 A.L.R.4th 690]; *Assisting Suicide, supra*, 86 Colum.L.Rev. at p. 350, fn. 22—at least one state has a common law crime of attempted suicide.) The absence of a criminal penalty for these acts is explained by the prevailing thought, to which Donaldson and others would disagree, that suicide or attempted suicide is an expression of mental illness that punishment cannot remedy. (*In re Joseph G., supra*, 34 Cal.3d at pp. 433-434.)

■ A majority of states, however, impose criminal penalties upon one who assists another to commit suicide. (*Cruzan v. Director, Mo. Health Dept., supra*, 497 U.S. 261, __ [111 L.Ed.2d 224, 243]; *In re Joseph G., supra*, 34 Cal.3d 429, 434; *All's Well, supra*, 22 U.C. Davis L.Rev. at pp. 290-291, fn. 106; *Assisting Suicide, supra*, 86 Colum.L.Rev. at p. 353.) One reason for the existence of criminal sanctions for those who aid a suicide is to discourage those who might encourage a suicide to advance personal motives. (*In re Joseph G., supra*, 34 Cal.3d at p. 437.) Another reason is the belief that the sanctity of life is threatened by one who is willing to participate in taking the life of another, even at the victim's request. (*Ibid.*) A third justification is that although the suicide victim may be mentally ill in wishing his demise, the aider is not necessarily mentally ill. (*Ibid.*)

These reasons justify a criminal statute punishing the aiding and encouraging of suicide, although suicide itself is not illegal. The state's interest in such a situation involves more than just a general commitment to the preservation of human life. In *Cruzan*, the state opposed discontinuing nutritional procedures for an unconscious patient with severe brain damage absent clear and convincing evidence this was the patient's wish. *Cruzan* emphasized the state's interest in guarding against potential abuses. Third parties, even family members, do not always act to protect the person whose life will end. *Cruzan* stated, "[w]e do not think a State is required to remain neutral in the face of an informed and voluntary decision by a physically-able adult to starve to death." (*Cruzan v. Director, Mo. Health Dept., supra*,

497 U.S. 261, __ [111 L.Ed.2d 224, 243].) The state is no less required to remain neutral in Donaldson's case.

### III.

■ Mondragon contends he has a constitutional right of free expression, secured by the United States and California Constitutions, to counsel and advise Donaldson in his suicide. He points out that suicide is not illegal and argues the state may not prohibit speech that encourages a lawful act.

We disagree that Penal Code section 401 impairs Mondragon's exercise of free speech. Our Supreme Court has interpreted section 401 to require affirmative and direct conduct such as furnishing a weapon or other means by which another could physically and immediately inflict a death-producing injury upon himself. (*In re Joseph G., supra,* 34 Cal.3d 429, 435-436; *Bouvia* v. *Superior Court, supra,* 179 Cal.App.3d 1127, 1145.) "To satisfy the burden of section 401, [Mondragon] would have to (1) have specifically intended [Donaldson's] suicide and (2) have had a direct participation in bringing it about." (*McCollum* v. *CBS, Inc.* (1988) 202 Cal.App.3d 989, 1007 [249 Cal.Rptr. 187].) The constitutional guaranties of free speech protect the freedom of individuals to speak, write, print or otherwise communicate information or opinion. (*Ulmer* v. *Municipal Court* (1976) 55 Cal.App.3d 263, 266 [127 Cal.Rptr. 445].)

Abstract teachings or advocacy of ideas are protected. (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447-449 [23 L.Ed.2d 430, 433-435, 89 S.Ct. 182].) Regulation of conduct bearing no necessary relation to the freedom to disseminate information or opinion is not constitutionally protected. (*Ulmer* v. *Municipal Court, supra,* 55 Cal.App.3d 263, 266.) Mondragon enjoys no constitutional protection for his planned participation in Donaldson's suicide. (*In re Joseph G., supra,* 34 Cal.3d 429, 435-436.)

The judgment is affirmed. The parties to bear their own costs on appeal.

Stone (S. J.), P. J., and Yegan, J., concurred.