JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 The State of Montana appeals from the Order of the First Judicial District Court granting summary judgment in favor of Robert Baxter, Stephen Speckart, M.D., C. Paul Loehnen, M.D., Lar Autio, M.D., George Risi, Jr., M.D., and Compassion & Choices; and from the District Court’s decision that a competent, terminally ill patient has a right to die with dignity under Article II, Sections 4 and 10 of the Montana Constitution, which includes protection of the patient’s physician from prosecution under the homicide statutes. We affirm in part and reverse in part.
¶2 We rephrase the following issues on appeal:
¶3 I. Whether the District Court erred in its decision that competent, terminally ill patients have a constitutional right to die with dignity, which protects physicians who provide aid in dying from prosecution under the homicide statutes.
¶4 II. Whether Mr. Baxter is entitled to attorney fees.
BACKGROUND
¶5 This appeal originated with Robert Baxter, a retired truck driver from Billings who was terminally ill with lymphocytic leukemia with diffuse lymphadenopathy. At the time of the District Court’s decision, Mr. Baxter was being treated with multiple rounds of chemotherapy, which typically become less effective over time. As a result of the disease and treatment, Mr. Baxter suffered from a variety of debilitating symptoms, including infections, chronic fatigue and weakness, anemia, night sweats, nausea, massively swollen glands, significant ongoing digestive problems and generalized pain and discomfort. The symptoms were expected to increase in frequency and *238 intensity as the chemotherapy lost its effectiveness. There was no cure for Mr. Baxter’s disease and no prospect of recovery. Mr. Baxter wanted the option of ingesting a lethal dose of medication prescribed by his physician and self-administered at the time of Mr. Baxter’s own choosing.
¶6 Mr. Baxter, four physicians, and Compassion & Choices, brought an action in District Court challenging the constitutionality of the application of Montana homicide statutes to physicians who provide aid in dying to mentally competent, terminally ill patients. The complaint alleged that patients have a right to die with dignity under the Montana Constitution Article II, Sections 4 and 10, which address individual dignity and privacy.
¶7 In December 2008, the District Court issued its Order and Decision, holding that the Montana constitutional rights of individual privacy and human dignity, together, encompass the right of a competent, terminally ill patient to die with dignity. The District Court held that a patient may use the assistance of his physician to obtain a prescription for a lethal dose of medication. The patient would then decide whether to self-administer the dose and cause his own death. The District Court further held that the patient’s right to die with dignity includes protection of the patient’s physician from prosecution under the State’s homicide statutes. Lastly, the District Court awarded Mr. Baxter attorney fees. The State appeals.
STANDARDS OF REVIEW
¶8 We review an order granting summary judgment de novo using the same standards applied by the District Court under M. R. Civ. P. 56. Bud-Kal v. City of Kalispell, 2009 MT 93, ¶ 15, 350 Mont. 25, 30, 204 P.3d 738, 743. Where there is a cross-motion for summary judgment, we review a district court’s decision to determine whether its conclusions were correct. Bud-Kal, ¶ 15. We review an award of attorney fees for abuse of discretion. Trs. of Ind. Univ. v. Buxbaum, 2003 MT 97, ¶ 15, 315 Mont. 210, 216, 69 P.3d 663, 667.
DISCUSSION
¶9 The parties in this appeal focus their arguments on the question of whether a right to die with dignity-including physician aid in dying-exists under the privacy and dignity provisions of the Montana Constitution. The District Court held that a competent, terminally ill patient has a right to die with dignity under Article II, Sections 4 and 10 of the Montana Constitution. Sections 4 and 10 address individual *239 dignity and the right to privacy, respectively. The District Court further held that the right to die with dignity includes protecting the patient’s physician from prosecution under Montana homicide statutes. The District Court concluded that Montana homicide laws are unconstitutional as applied to a physician who aids a competent, terminally ill patient in dying.
¶10 While we recognize the extensive briefing by the parties and amici on the constitutional issues, this Court is guided by the judicial principle that we should decline to rule on the constitutionality of a legislative act if we are able to decide the case without reaching constitutional questions. State v. Adkins, 2009 MT 71, ¶ 12, 349 Mont. 444, 447, 204 P.3d 1, 5; Sunburst Sch. Dist. No. 2 v. Texaco, Inc., 2007 MT 183, ¶ 62, 338 Mont. 259, 279, 165 P.3d 1079, 1093. Since both parties have recognized the possibility of a consent defense to a homicide charge under § 45-2-211(1), MCA, we focus our analysis on whether the issues presented can be resolved at the statutory, rather than the constitutional, level.
¶11 We start with the proposition that suicide is not a crime under Montana law. In the aid in' dying situation, the only person who might conceivably be prosecuted for criminal behavior is the physician who prescribes a lethal dose of medication. In that the claims of the plaintiff physicians are premised in significant part upon concerns that they could be prosecuted for extending aid in dying, we deem it appropriate to analyze their possible culpability for homicide by examining whether the consent of the patient to his physician’s aid in dying could constitute a statutory defense to a homicide charge against the physician.
¶12 The consent statute would shield physicians from homicide liability if, with the patients’ consent, the physicians provide aid in dying to terminally ill, mentally competent adult patients. We first determine whether a statutory consent defense applies to physicians who provide aid in dying and, second, whether patient consent is rendered ineffective by § 45-2-2 ll(2)(d), MCA, because permitting the conduct or resulting harm “is against public policy.”
¶13 Section 45-5-102(1), MCA, states that a person commits the offense of deliberate homicide if “the person purposely or knowingly causes the death of another human being ....” Section 45-2-211(1), MCA, establishes consent as a defense, stating that the “consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense.” Thus, if the State prosecutes a physician for providing aid in dying to a mentally competent, terminally ill adult *240 patient who consented to such aid, the physician may be shielded from liability pursuant to the consent statute. This consent defense, however, is only effective if none of the statutory exceptions to consent applies. Section 45-2-211(2), MCA, codifies the four exceptions:
Consent is ineffective if: (a) it is given by a person who is legally incompetent to authorize the conduct charged to constitute the offense; (b) it is given by a person who by reason of youth, mental disease or defect, or intoxication is unable to make a reasonable judgment as to the nature or harmfulness of the conduct charged to constitute the offense; (c) it is induced by force, duress, or deception; or (d) it is against public policy to permit the conduct or the resulting harm, even though consented to.
The first three statutory circumstances rendering consent ineffective require case-by-case factual determinations. We therefore confine our analysis to the last exception and determine whether, under Montana law, consent to physician aid in dying is against public policy. For the reasons stated below, we find no indication in Montana law that physician aid in dying provided to terminally ill, mentally competent adult patients is against public policy.
¶14 Section 45-2-2 11(2)(d), MCA, renders consent ineffective if “it is against public policy to permit the conduct or the resulting harm, even though consented to.” We addressed the applicability of this provision in State v. Mackrill, 2008 MT 297, 345 Mont. 469, 191 P.3d 451. This Court held that the consent of a victim is not a defense to the charge of aggravated assault under § 45-5-202(1), MCA. Mackrill, ¶ 33. The Mackrill decision, while not limiting the exception’s reach, applied the “against public policy” exception to situations in which violent, public altercations breach public peace and endanger others in the vicinity. Physician aid in dying, as analyzed below, does not fall within the scope of what this Court has thus far identified as “against public policy.”
¶15 The Mackrill case arose from a particularly violent altercation between Jason Mackrill and Robert Gluesing outside a Livingston bar. Mackrill, who had been drinking heavily, spent the better part of the evening disrupting other bar-goers, including Gluesing. When a bartender refused to serve Mackrill, Gluesing offered Mackrill a few dollars and encouraged him to go elsewhere. Mackrill became obstinate and refused to leave. When the bartender picked up the phone to call the police, Gluesing escorted Mackrill out of the bar. Once outside, Mackrill began punching Gluesing, including a “very solid shot” that caused Gluesing’s feet to come off the ground and the back of his head *241 to hit the pavement. A witness called 9-1-1 and paramedics arrived on the scene. They found Gluesing unconscious and bleeding in the street. He was transported to the hospital and treated for head injuries, including a skull fracture.
¶16 The State charged Mackrill with one count of aggravated assault, a felony under § 45-5-202, MCA. He pleaded not guilty and filed a Notice of Affirmative Defenses, in which he stated he would argue consent as a defense at trial. The jury found Mackrill guilty. He then filed a post-trial motion claiming the State failed to introduce evidence upon which the jury could conclude Gluesing did not consent to the fight. After a hearing on the matter, the district court denied the motion. Mackrill appealed. This Court concluded that consent is not an effective defense against an assault charge under § 45-5-202(1), MCA. Mackrill, ¶ 33.
¶17 The Mackrill decision is the only Montana case addressing the public policy exception to consent. It demonstrates one set of circumstances in which consent as a defense is rendered ineffective because permitting the conduct or resulting harm is “against public policy.” This “against public policy” exception to consent applies to conduct that disrupts public peace and physically endangers others. Clearly, under Mackrill, unruly, physical and public aggression between individuals falls within the parameters of the “against public policy” exception. The men were intoxicated, brawling in a public space, and endangering others in the process.
¶18 A survey of courts that have considered this issue yields unanimous understanding that consent is rendered ineffective as “against public policy” in assault cases characterized by aggressive and combative acts that breach public peace and physically endanger others.
¶19 The State of Washington is home to an unusual volume of these “public policy” exception cases. Washington courts have consistently held that the “public policy” exception applies only to brutish, irrational violence that endangers others. In State v. Dejarlais, the Supreme Court of Washington held that consent is not a defense to violations of a domestic-violence protection order. 136 Wn. 2d 939, 942, 969 P.2d 90, 91 (Wash. 1998). In State v. Hiott, the court determined that consent is not a defense to a game in which two people agreed to shoot BB guns at each other because it was a breach of the public peace. 97 Wn. App. 825, 828, 987 P.2d 135, 137 (Wash. App. Div. 2 1999). In State v. Weber, the court held consent is not a defense to the charge of second degree assault between two incarcerated persons. 137 *242 Wn. App. 852, 860, 155 P.3d 947, 951 (Wash. App. Div. 3 2007). The court noted there “is nothing redeeming or valuable in permitting fighting and every reason to dissuade it.” Weber, 155 P.3d at 951.
¶20 In State v. Fransua, the Court of Appeals of New Mexico held that one person’s taunting invitation to “go ahead” and shoot him did not establish a valid consent defense for another person who took him up on the offer. 85 N.M. 173, 174, 510 P.2d 106, 107 (N.M. App. 1973). In the Superior Court of New Jersey, a defendant claimed he was not guilty of assault and battery because he and his wife agreed that if she consumed alcohol he would physically assault her as punishment. State v. Brown, 143 N.J. Super. 571, 580, 364 A.2d 27, 32 (N.J. Super. L. Div. 1976). He argued consent as a defense after the state charged him with assault and battery. Brown, 364 A.2d at 28. The court held that failing to punish Brown “would seriously threaten the dignity, peace, health and security of our society.” Brown, 364 A.2d at 32.
¶21 The above acts-including the Mackrill brawl-illustrate that sheer physical aggression that breaches public peace and endangers others is against public policy. In contrast, the act of a physician handing medicine to a terminally ill patient, and the patient’s subsequent peaceful and private act of taking the medicine, are not comparable to the violent, peace-breaching conduct that this Court and others have found to violate public policy.
¶22 The above cases address assaults in which the defendant alone performs a direct and violent act that causes harm. The bar brawler, prison fighter, BB gun-shooter, and domestic violence aggressor all committed violent acts that directly caused harm and breached the public peace. It is clear from these cases that courts deem consent ineffective when defendants directly commit blatantly aggressive, peace-breaching acts against another party.
¶23 In contrast, a physician who aids a terminally ill patient in dying is not directly involved in the final decision or the final act. He or she only provides a means by which a terminally ill patient himself can give effect to his life-ending decision, or not, as the case may be. Each stage of the physician-patient interaction is private, civil, and compassionate. The physician and terminally ill patient work together to create a means by which the patient can be in control of his own mortality. The patient’s subsequent private decision whether to take the medicine does not breach public peace or endanger others.
¶24 Although the “against public policy” exception of § 45-2-211(2)(d), MCA, is not limited to violent breaches of the peace as discussed in the above cases, we see nothing in the case law facts or analysis suggesting *243 that a patient’s private interaction with his physician, and subsequent decision regarding whether to take medication provided by a physician, violate public policy. We thus turn to a review of Montana statutory law.
¶25 We similarly find no indication in Montana statutes that physician aid in dying is against public policy. The Montana Rights of the Terminally 111 Act (Terminally 111 Act) and the homicide statute’s narrow applicability to “another” human being, do not indicate that physician aid in dying is against public policy.
¶26 Under § 45-5-102, MCA, a “person commits the offense of deliberate homicide if: (a) the person purposely or knowingly causes the death of another human being ....” In physician aid in dying, the physician makes medication available for a terminally ill patient who requests it, and the patient would then choose whether to cause his own death by self-administering the medicine. The terminally ill patient’s act of ingesting the medicine is not criminal. There is no language in the homicide statute indicating that killing “oneself,” as opposed to “another,” is a punishable offense, and there is no separate statute in Montana criminalizing suicide. There is thus no indication in the homicide statutes that physician aid in dying-in which a terminally ill patient elects and consents to taking possession of a quantity of medicine from a physician that, if he chooses to take it, will cause his own death-is against public policy.
¶27 There is similarly no indication in the Terminally 111 Act that physician aid in dying is against public policy. The Terminally 111 Act, by its very subject matter, is an apt statutory starting point for understanding the legislature’s intent to give terminally ill patients-like Mr. Baxter-end-of-life autonomy, respect and assurance that their life-ending wishes will be followed. The Terminally 111 Act expressly immunizes physicians from criminal and civil liability for following a patient’s directions to withhold or withdraw life-sustaining treatment. Section 50-9-204, MCA. Indeed, the legislature has criminalized the failure to act according to the patient’s wishes. Section 50-9-206, MCA. Other parts of the Terminally 111 Act also resonate with this respect for the patient’s end-of-life preferences. Section 50-9-205, MCA, explicitly prohibits, “for any purpose,” calling the patient’s death a “suicide or homicide,” and § 50-9-501, MCA, charges the Montana Attorney General with creating a “declaration registry” and waging a statewide campaign to educate Montanans about end-of-life decisionmaking. The statute even establishes a specialized state fund account specifically for the registry and *244 education program. Section 50-9-502(b), MCA.
¶28 The Rights of the Terminally 111 Act very clearly provides that terminally ill patients are entitled to autonomous, end-of-life decisions, even if enforcement of those decisions involves direct acts by a physician. Furthermore, there is no indication in the Rights of the Terminally 111 Act that an additional means of giving effect to a patient’s decision-in which the patient, without any direct assistance, chooses the time of his own death-is against public policy.
¶29 The Montana Legislature codified several means by which a patient’s life-ending request can be fulfilled. The Terminally 111 Act authorizes an individual “of sound mind and 18 years of age or older to execute at any time a declaration governing the withholding or withdrawal of life-sustaining treatment.” Section 50-9-103, MCA. The Terminally 111 Act defines “life-sustaining treatment” as any medical procedure or intervention that “serves only to prolong the dying process.” Section 50-9-102(9), MCA. The declaration is operative when it is communicated to the physician or registered nurse and the declarant is determined to be in a terminal condition and no longer able to vocalize his end-of-life wishes. Section 50-9-105, MCA.
¶30 The Terminally 111 Act, in short, confers on terminally ill patients a right to have their end-of-life wishes followed, even if it requires direct participation by a physician through withdrawing or withholding treatment. Section 50-9-103, MCA. Nothing in the statute indicates it is against public policy to honor those same wishes when the patient is conscious and able to vocalize and carry out the decision himself with self-administered medicine and no immediate or direct physician assistance.
¶31 The Terminally 111 Act contains declaration forms a patient may use to legally ensure his end-of-life instructions will be followed. The forms shed critical light on the end-of-life roles of terminally ill Montanans and their physicians, as envisioned and codified by the legislature. The first declaration states:
If I should have an incurable or irreversible condition that, without the administration of life-sustaining treatment, will, in the opinion of my attending physician or attending advanced practice registered nurse, cause my death within a relatively short time and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician or attending advanced practice registered nurse, pursuant to the Montana Rights of the Terminally 111 Act, to withhold or withdraw treatment that only prolongs the process of dying and is not *245 necessary to my comfort or to alleviate pain.
Section 50-9-103(2), MCA. The declaration language of § 50-9-103, MCA, not only highlights the legislature’s intent to provide terminally ill patients with various means to express (and have followed) their autonomous end-of-life preferences, but also authorizes physician involvement in both the terminal diagnosis and the act of withdrawing or withholding treatment.
¶32 The legislature, in creating this legally-enforceable declaration, also immunized physicians and medical professionals who act in accordance with the patient’s wishes. The statute shields physicians from liability for following a patient’s instructions to stop life-sustaining treatment, or refrain from treating him altogether. Section 50-9-204, MCA. The Dissent states that the Terminally 111 Act only allows the “taking away of, or refraining from giving” life-sustaining medical treatment. The Dissent’s definition of “withdraw” confirms that this “taking away” is, itself, a direct act by the physician. “Withdrawal” is “the act of taking back or away” something that was granted. Webster’s Third New International Dictionary of the English Language 2627 (Philip Babcock Gove ed., G. & C. Merriam Co. 1971) (emphasis added). The “giving” is an act, as is the “taking away.” The Terminally 111 Act authorizes physicians to commit a direct act of withdrawing medical care, which hastens death. In contrast, the physician’s involvement in aid in dying consists solely of making the instrument of the “act” available to the terminally ill patient. The patient himself then chooses whether to commit the act that will bring about his own death. The legislature codified public policy by expressly immunizing physicians who commit a direct act that gives effect to the life-ending wishes of a terminally ill patient. Section 50-9-204, MCA. There is no suggestion in the Act that a lesser physician involvement (making available a lethal does of medicine)-which is then vetted by a terminally ill patient’s intervening choice and subsequent self-administered ingestion-is against public policy.
¶33 The Terminally 111 Act explicitly shields physicians from criminal, civil or professional liability for the act of withdrawing or withholding life-sustaining treatment from a terminally ill patient who requests it. Section 50-9-204, MCA.[1] The legislature devoted an entire *246 section to codifying this immunity, ensuring that physicians and nurses will not be held liable for acting consistent with a terminally ill patient’s decision to die. Section 50-9-204, MCA, provides an extensive list of medical professionals and others exempt from prosecution:
(a) a physician or advanced practice registered nurse who causes the withholding or withdrawal of life-sustaining treatment from a qualified patient; (b) a person who participates in the withholding or withdrawal of life-sustaining treatment under the direction or with the authorization of the physician or advanced practice registered nurse; (c) emergency medical services personnel who cause or participate in the withholding or withdrawal of life-sustaining treatment under the direction of or with the authorization of a physician or advanced practice registered nurse or who on receipt of reliable documentation follow a living will protocol....
Section 50-9-204, MCA (emphasis added). The section also immunizes health care facilities, health care providers, and the patient’s designee. Section 50-9-204(e), MCA. The Terminally 111 Act’s second enactment expands this immunity to include emergency medical service personnel. Section 50-9-204(c), MCA. The statute explicitly states that the above individuals are “not subject to civil or criminal liability or guilty of unprofessional conduct.” Section 50-9-204(1), MCA. This encompassing immunity for medical professionals reinforces the terminally ill patient’s right to enforce his decision without fear that those who give effect to his wishes will be prosecuted.
¶34 Further, the legislature criminalized the failure to follow a patient’s end-of-life instructions. A physician “who willfully fails to record the determination of terminal condition or the terms of a declaration” is punishable by a maximum $500 fine, a maximum one year in jail, or both. Section 50-9-206(2), MCA. A person who “purposely conceals, cancels, defaces, or obliterates the declaration of another without the declarant’s consent” is punishable by the same. Section 50-9-206(3), MCA. The statute’s message is clear: failure to give effect to a terminally ill patient’s life-ending declaration is a crime.
¶35 Other parts of the Terminally 111 Act similarly reflect legislative respect for the patient’s end-of-life autonomy and the physician’s legal obligation to comply with the patient’s declaration. Section 50-9-205, *247 MCA, prohibits, for any purpose, treating the death as either “suicide or homicide.” The legislature, by prohibiting anyone from deeming the act a homicide or suicide, ensured that insurance companies cannot punish a terminally ill patient and his family for the patient’s choice to die.
¶36 The provision also lists behaviors not supported by the statute. Notably, physician aid in dying is not listed. Section 50-9-205(7), MCA, reads: “This chapter does not condone, authorize, or approve mercy killing or euthanasia.” Physician aid in dying is, by definition, neither of these. Euthanasia is the “intentional putting to death of a person with an incurable or painful disease intended as an act of mercy.” Stedman’s Medical Dictionary 678 (28th ed., Lippincott Williams & Wilkins 2006). The phrase “mercy killing” is the active term for euthanasia defined as “a mode of ending life in which the intent is to cause the patient’s death in a single act.” Stedman’s Medical Dictionary at 678. Neither of these definitions is consent-based, and neither involves a patient’s autonomous decision to self-administer drugs that will cause his own death.
¶37 The final part of the Terminally 111 Act orders the Montana Attorney General to “establish and maintain a health care declaration registry” in which declarations are stored and updated. Section 50-9-501, MCA. The provision also creates a health care declaration account in the state special revenue fund, which the Attorney General must use to “create and maintain the health care declaration registry” and to create an education and outreach program. Section 50-9-502(b), MCA. The program must pertain to “advance health care planning and end-of-life health care decisionmaking.” Section 50-9-505( 1), MCA. The program must also “explain the need for readily available legal documents that express an individual’s health care wishes.” Section 50-9-505(c), MCA. The registry requirement, outreach and education provisions, and state funding for both, indicate legislative intent to honor and promulgate the rights of terminally ill patients to autonomously choose the direction of their end-of-life medical care. There is no indication in the statutes that another choice-physician aid in dying-is against this legislative ethos of honoring the end-of-life decisions of the terminally ill.
¶38 There is no indication in the Rights of the Terminally 111 Act that physician aid in dying is against public policy. Indeed, the Act reflects legislative respect for the wishes of a patient facing incurable illness. The Act also indicates legislative regard and protection for a physician who honors his legal obligation to the patient. The Act immunizes a *248 physician for following the patient’s declaration even if it requires the physician to directly unplug the patient’s ventilator or withhold medicine or medical treatment that is keeping the patient alive. Physician aid in dying, on the other hand, does not require such direct involvement by a physician. Rather, in physician aid in dying, the final death-causing act lies in the patient’s hands. In light of the longstanding, evolving and unequivocal recognition of the terminally ill patient’s right to self-determination at the end of life in Title 50, chapter 9, MCA, it would be incongruous to conclude that a physician’s indirect aid in dying is contrary to public policy.
¶39 There are three central problems with the Dissent’s response. First, the Dissent applies § 45-5-105, MCA-a statute that factually does not apply to Mr. Baxter’s appeal. This statute only applies if the suicide does not occur. Second, the Dissent massages the statute’s legislative history into makeshift legislation, which it then proffers as public policy. Such analysis directly violates this Court’s precedent regarding statutory interpretation.
¶40 The Dissent first cites § 45-5-105, MCA, stating that a person may be prosecuted for aiding or soliciting suicide only if the individual does not die. Dissent, ¶ 101. The statute’s plain meaning is clear. It is also inapplicable. The narrow scenario we have been asked to consider on appeal involves the situation in which a terminally ill patient affirmatively seeks a lethal dose of medicine and subsequently self-administers it, causing his own death. Section 45-5-105, MCA, unambiguously applies only when the suicide does not occur.
¶41 Under this Court’s precedent, the inquiry stops there. We have repeatedly held that we will not interpret a statute beyond its plain language if the language is clear and unambiguous. Mont. Sports Shooting Ass’n v. State, 2008 MT 190, ¶ 11, 344 Mont. 1, 4, 185 P.3d 1003, 1006; State v. Letasky, 2007 MT 51, ¶ 11, 336 Mont. 178, 181, 152 P.3d 1288, 1290 (“We interpret a statute first by looking to the statute’s plain language, and if the language is clear and unambiguous, no further interpretation is required.”). Here, the legislature could not have provided clearer, more unambiguous language. If the person does not die, the statute is triggered. If they do die, the statute is not triggered. The statute provides only one clear set of circumstances where a person may be prosecuted. There is simply nothing ambiguous about it.
¶42 While conceding on the one hand that § 45-5-105, MCA, applies only when the suicide does not occur, the Dissent nonetheless unilaterally revises the statute, stating that “under Montana law, *249 physicians who assist in a suicide are subject to criminal prosecution irrespective of whether the patient survives or dies.” Dissent, ¶ 102. This is incorrect under the law. Not only does the language of the statute clearly and only address the scenario in which the “suicide does not occur” but the Commission comments themselves do not even provide enlightenment on the legislature’s intent regarding the language of the aid or soliciting suicide statute itself. Instead, the Commission comments speak of a different statute (and crime) altogether: Homicide. In fact, the comments analyze language, such as “agent of death,” that does not even appear in the aid or soliciting statute or anywhere else in the Montana code. The Dissent not only disregards this Court’s precedent regarding statutory interpretation, but it also grants the uncodified comments of eleven unelected individuals the weight of law.
¶43 The Dissent argues that consent to physician aid in dying is against public policy simply because the conduct is defined as an offense under the criminal statutes. That reasoning is circular. The Dissent cannot obviate a separate consent statute by simply saying that all statutory crimes are by definition against public policy, therefore consent to that conduct is also against public policy. If that were the case, the legislature would not have felt compelled to enact a separate consent statute. By enacting this separate consent statute, the legislature obviously envisioned situations in which it is not against public policy for a victim to consent to conduct that would otherwise constitute an offense under the criminal statutes.
¶44 Even if this Court were to extend consideration to § 45-5-105, MCA, as a generalized reflection of the legislature’s views on third party involvement in suicides, there remains no indication that the statute was ever intended to apply to the very narrow set of circumstances in which a terminally ill patient himself seeks out a physician and asks the physician to provide him the means to end his own life. As the Dissent states, the original enactment addressed situations of a third party “encouraging” a suicide. Dissent, ¶ 99. The present version reflects the same focus in the “soliciting” language. The statute’s plain language addresses the situation in which a third party unilaterally solicits or aids another person. In physician aid in dying, the solicitation comes from the patient himself, not a third party physician.
¶45 There is no indication that the 1973 Montana legislators contemplated the statute would apply to this specific situation in which a terminally ill patient seeks a means by which he can end his *250 own incurable suffering. In fact, it was not until twelve years later in 1985, that the legislature enacted the Rights of the Terminally 111 Act, which squarely addresses the modern complexities of physician- and technology-dependent end-of-life care provided to terminally ill Montanans. Since then, the legislature-as illustrated in the Terminally 111 Act analysis above-has carefully cultivated a statutory scheme that gives terminally ill Montanans the right to autonomously choose what happens to them at the end of painful terminal illness. ¶46 Finally, we determine whether the District Court erred in awarding Mr. Baxter attorney fees. Following entry of the District Court’s judgment on the constitutional claims, Mr. Baxter moved to amend under M. R. Civ. P. 59(g) to include an award of attorney fees as supplemental relief under § 27-8-313, MCA, and the private attorney general doctrine. The District Court awarded attorney fees to Mr. Baxter under the private attorney general doctrine. We review a grant or denial of attorney fees for abuse of discretion. Trs. of Ind. Univ. v. Buxbaum, 2003 MT 97, ¶ 15, 315 Mont. 210, 216, 69 P.3d 663, 667.
¶47 The private attorney general doctrine applies when the government fails to properly enforce interests which are significant to its citizens. Montanans for the Responsible Use of the Sch. Trust v. State ex rel. Bd. of Land Commissioners, 1999 MT 263, ¶ 64, 296 Mont. 402, 421, 989 P.2d 800, 811. The private attorney general doctrine, however, applies only when constitutional interests are vindicated. Am. Cancer Soc’y v. State, 2004 MT 376, ¶ 21, 325 Mont. 70, 78, 103 P.3d 1085, 1091. Our holding today is statute-based. Therefore, without the vindication of constitutional interests, an award of fees under the private attorney general doctrine is not warranted.
¶48 Although attorney fees may be appropriate “further relief’ under § 27-8-313, MCA, “such fees are only appropriate if equitable considerations support the award.” United Nat’l Ins. Co. v. St. Paul Fire & Marine Ins. Co., 2009 MT 269, ¶ 38, 352 Mont. 105, 118, 214 P.3d 1260, 1271. As in United National, the equitable considerations here do not support an award of attorney fees. Mr. Baxter is accompanied by other plaintiffs, including four physicians and Compassion & Choices, a national nonprofit organization. The relief herein granted to the Plaintiffs is not incomplete or inequitable without the Montana taxpayers having to pay the attorney fees.
¶49 In conclusion, we find nothing in Montana Supreme Court precedent or Montana statutes indicating that physician aid in dying is against public policy. The “against public policy” exception to *251 consent has been interpreted by this Court as applicable to violent breaches of the public peace. Physician aid in dying does not satisfy that definition. We also find nothing in the plain language of Montana statutes indicating that physician aid in dying is against public policy. In physician aid in dying, the patient-not the physician-commits the final death-causing act by self-administering a lethal dose of medicine.
¶50 Furthermore, the Montana Rights of the Terminally 111 Act indicates legislative respect for a patient’s autonomous right to decide if and how he will receive medical treatment at the end of his life. The Terminally 111 Act explicitly shields physicians from liability for acting in accordance with a patient’s end-of-life wishes, even if the physician must actively pull the plug on a patient’s ventilator or withhold treatment that will keep him alive. There is no statutory indication that lesser end-of-life physician involvement, in which the patient himself commits the final act, is against public policy. We therefore hold that under § 45-2-211, MCA, a terminally ill patient’s consent to physician aid in dying constitutes a statutory defense to a charge of homicide against the aiding physician when no other consent exceptions apply.
¶51 The District Court’s ruling on the constitutional issues is vacated, although the court’s grant of summary judgment to Plaintiffs/Appellees is affirmed on the alternate statutory grounds set forth above. The award of attorney fees is reversed.
JUSTICES COTTER, WARNER and MORRIS concur.

 The Dissent has erred in its statement that the operative words in the Terminally 111 Act are those “permitting a patient” to withdraw or withhold life-sustaining treatment. Dissent, ¶ 107. The Rights of the Terminally 111 Act was created to address the situation in which patients cannot act on their own behalf and therefore must authorize others to act for them. The only individuals who act in this statute are *246 non-patients-particularly, medical professionals-who follow the directions of a terminally ill patient and affirmatively withdraw or withhold treatment.