Filed 10/29/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| CHRISTY LYNNE DONOROVICH-ODONNELL et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>KAMALA D. HARRIS, as Attorney General, etc., et al.,<br><br>Defendants and Respondents. | D068758<br><br><br>(Super. Ct. No.<br> 37-2015-00016404-CU-CR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory

W. Pollack, Judge.  Affirmed.

O'Melveny & Myers, John Kappos, Dimitri Portnoi, Jason A. Orr; Horvitz &

Levy, Jon B. Eisenberg, Barry R. Levy, Dean A. Bochner; Arnold & Porter, Jerome B.

Falk, Jr., Adam J. Kretz; and Kevin Díaz for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Kathleen Kenealy, Chief Assistant Attorney

General, Julie Weng-Gutierrez, Assistant Attorney General, Niromi W. Pfeiffer and

Darrell W. Spence, Deputy Attorneys General, for Defendant and Respondent.

Manning & Kass, Ellrod, Ramirez, Trester, Eugene P. Ramirez and Darin L. Wessel for Defendant and Respondent Jackie Lacey.

John F. Whisenhunt, County Counsel (Sacramento), Krista C. Whitman and June Powells-Mays, Deputy County Counsel, for Defendant and Respondent Ann Marie Schubert.

Thomas E. Montgomery, County Counsel (San Diego), and Thomas E. Bunton, Deputy County Counsel, for Defendant and Respondent Bonnie Dumanis.

Most states, including California, do not classify suicide or attempted suicide as a crime. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1373 (*Ryan N.*).) Most states, however, including California, impose criminal liability on a person aiding and abetting suicide. (*Cruzan v. Director, Missouri Dept. of Health* (1990) 497 U.S. 261, 280; *Ryan N.,* at p. 1374, fn. 4.) Penal Code section 401, in effect since 1873, provides: "Every person who deliberately aids, or advises, or encourages another to commit suicide, is guilty of a felony."[1] The crime is punishable by a state prison term of 16 months, two years, or three years (§ 18, subd. (a); *Ryan N., supra,* 92 Cal.App.4th at p. 1374, fn. 4), and a fine of up to $10,000 (§ 672).

On appeal, plaintiffs contend section 401 is inapplicable to physician aid-in-dying because prescribing a lethal dose of drugs a patient may or may not have filled or take is not *direct* participation in suicide and, in any event, the legislative history of section 401

---

[1] Further statutory references are to the Penal Code unless otherwise specified. Section 401 was formerly numbered section 400. (§ 401.)

shows the Legislature never intended that section 401 apply to a person furnishing the means of suicide. Alternatively, plaintiffs contend section 401 as applied to physician aid-in-dying violates the state constitutional right to autonomy privacy. (Cal. Const., art. 1, § 1.)

On October 5, 2015, Governor Jerry Brown signed the End of Life Option Act, which authorizes a terminally ill patient with the capacity to make medical decisions to request a prescription for a lethal dose of drugs, insulates a prescribing physician from criminal liability, and sets forth rigorous procedures and safeguards to protect against abuse. (Assem. Bill No. 15 (2015-2016 2d Ex. Sess.) § 1 (Assembly Bill 15).)[2] The parties agree Assembly Bill 15 does not render the appeal moot because it will likely not become effective in time to benefit plaintiffs, particularly Christy Lynne Donorovich-Odonnell, given her life expectancy,[3] and the measure's future is uncertain because opponents have filed paperwork with the Attorney General to challenge it by referendum on the state ballot in 2016.

We have great compassion for plaintiffs, but we conclude their statutory and constitutional arguments lack merit. We agree with defendants that physician aid-in-dying, and attendant procedures and safeguards against abuse, are matters for the

---

[2]     We grant the Attorney General's unopposed request that we take judicial notice of Assembly Bill 15 and material from its legislative history.

[3]     Assembly Bill 15 was enacted in special session, and thus its effective date is "the 91st day after adjournment of the special session at which the bill was passed." (Cal. Const., art. IV, § 8(c)(1).) The special session has reportedly not adjourned.

Legislature. We affirm the judgment for defendants entered after their demurrers to the complaint were sustained.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

Plaintiffs Donorovich-Odonnell, Elizabeth Antoinette Melanie Gobertina Wallner, and Wolf Alexander Breiman, are all terminally ill. Donorovich-Odonnell, who resides in Santa Clarita, suffers from stage IV adenocarcinoma of the left lung, which has metastasized to her brain, liver, spine, and rib. At the time of the complaint's filing in May 2015, her estimated life expectancy was less than six months. She is morphine intolerant and cannot benefit from many of the most common and effective forms of pain management. Wallner, who resides in Sacramento, has stage IV colon cancer, which has metastasized to her liver and lung. Breiman, who resides in Ventura, has multiple myeloma, a blood cancer.

Donorovich-Odonnell, Wallner, and Breiman are competent adults who "desire the option of a peaceful death without suffering, and they want [a]id-in-[d]ying to be an option in their end-of-life health care." They "all want to live," but "accept their terminal prognoses." Having a prescription for a lethal dose of drugs "they could self-administer if their suffering became too great in the final days would provide great comfort to them and would alleviate some anxiety related to the dying process."

Plaintiff Lynette Carol Cederquist, M.D., resides in San Diego. She is board certified in hospice and palliative medicine and internal medicine. In addition to being a

---

4    Because we review a demurrer ruling, the facts are derived from the complaint. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

4

medical school clinical professor, she regularly treats patients and advises them on end-of-life options. She does not provide aid-in-dying because she fears prosecution under section 401. If such treatment were lawful in California, "she would be willing to write a prescription for medication to terminally ill, competent adults who, at their own discretion, could exercise the option to self-administer the drug." She considers aid-in-dying "a compassionate and ethical choice in appropriate circumstances," and believes some of her terminally ill patients would choose that option.

In May 2015, plaintiffs brought an action in San Diego County Superior Court for declaratory and injunctive relief. Defendants are public officials with the power of criminal prosecution: Kamala D. Harris, Attorney General of California; Jackie Lacey, District Attorney for Los Angeles County; Ann Marie Schubert, District Attorney for Sacramento County; and Bonnie Dumanis, District Attorney for San Diego County.

The complaint sought a judicial declaration that section 401 is inapplicable to physicians who provide the option of aid-in-dying to terminally ill, competent adults who request such aid. It also sought an injunction permanently prohibiting defendants from prosecuting physicians "who provide advice and write a prescription for [lethal] medication" under such circumstances. The complaint alleged that as applied to physicians providing aid-in-dying to terminally ill patients, section 401 violates state constitutional rights of privacy and liberty (Cal. Const., art 1, § 1); free speech (Cal. Const., art. 1, § 2); and equal protection (Cal. Const., art. 1, § 7). The court granted plaintiffs' request for trial preference.

5

Attorney General Harris and District Attorney Lacey separately demurred to the complaint, and District Attorneys Schubert and Dumanis joined in Harris's demurrer. At the July 2015 hearing on the demurrers, the court stated: "[T]he first point I want to make is what is not on the table here today. This is not a case about the right to die. In California, suicide is legal. It's not illegal to take one's own life. There is constitutional authority that's settled law that a patient can decline treatment even if that . . . results in the patient's death. So that's really not an issue. Whether the plaintiff[s] . . . can travel to a state that allows assisted suicide [is also] . . . not an issue. Clearly they can."

The court characterized the issue as "whether there is a constitutional right to have an assisted suicide with concomitant immunity to the assisting party." The court determined that under established precedent, *Donaldson v. Lungren* (1992) 2 Cal.App.4th 1614 (*Donaldson*), *Washington v. Glucksberg* (1997) 521 U.S. 702 (*Glucksberg*), and *Vacco v. Quill* (1997) 521 U.S. 793 (*Vacco*), there is no such right. The court believed the issue was for the Legislature, and "the answer is not to declare a statute [section 401], which is clearly constitutional, unconstitutional." The court granted the demurrers without leave to amend.

Judgment for defendants was entered in August 2015. This appeal followed, and we granted in part plaintiffs' request for calendar preference.

6

DISCUSSION

I

*Standard of Review*

A demurrer is intended to test the sufficiency of a complaint as a matter of law, and thus we independently review a judgment sustaining a demurrer without leave to amend. (*Holiday Matinee, Inc. v. Rambus, Inc.* (2004) 118 Cal.App.4th 1413, 1420.) "We assume the truth of the allegations in the complaint, but do not assume the truth of contentions, deductions, or conclusions of law. [Citation.] It is error for the trial court to sustain a demurrer if the plaintiff has stated a cause of action under any possible legal theory, and it is an abuse of discretion for the court to sustain a demurrer without leave to amend if the plaintiff has shown there is a reasonable possibility a defect can be cured by amendment." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247.)

II

*Interpretation of Section 401*

A

Plaintiffs contend the court misinterpreted section 401 to apply to physician aid-in-dying. Whether section 401 applies to physicians in those circumstances is an issue of first impression.

"In construing statutes, we aim 'to ascertain the intent of the [Legislature] so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.] We look first to the words of the statute, 'because the statutory language is generally the

7

most reliable indicator of legislative intent.' " (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77.) "If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818.)

Section 401 provides: "*Every person* who deliberately *aids*, or advises, or encourages another to commit suicide, is guilty of a felony." (Italics added.) "The language of section 401 closely resembles that used in other parts of the Penal Code to define or describe the principal criminal liability of persons who 'aid and abet' the commission of a crime, and the courts have frequently used the terms aiding and abetting interchangeably with those employed by section 401 in discussing the elements of the crime defined by that statute." (*Ryan N., supra,* 92 Cal.App.4th at p. 1374.)

Although section 401 appears to criminalize simply giving advice or encouragement, "the courts have . . . required something more than mere verbal solicitation of another person to commit a hypothetical act of suicide. . . . [T]he courts have interpreted the statute as proscribing 'the *direct* aiding and abetting of a *specific suicidal act*. . . . Some *active and intentional participation* in the events leading to the suicide are required in order to establish a violation.' [Citation.] Thus, . . . to prove a violation of section 401 it is necessary to establish all of the following essential elements: (1) the defendant specifically intended the victim's suicide; (2) the defendant undertook some active and direct participation in bringing about the suicide, *such as by furnishing the victim with the means of suicide*; and, finally, (3) the victim actually committed a

8

specific, overt act of suicide.' " (*Ryan N., supra,* 92 Cal.App.4th at p. 1374 (last italics added).)[5]

In *People v. Matlock* (1959) 51 Cal.2d 682, the California Supreme Court held a jury instruction on section 401 was inappropriate when the defendant was charged with strangling the victim and claimed he did so at the victim's request. Relying on an Oregon opinion, which addressed a statute similar to section 401, the court explained: " '[The statute] contemplates some participation in the events leading up to the commission of the final overt act, *such as furnishing the means for bringing about death,–the gun, the knife, the poison, or providing the water, for the use of the person who himself commits the act of self-murder*.' " (*Id.* at p. 694, italics added, citing *State v. Bouse* (1953) 199 Ore. 676, 702-703 [264 P.2d 800] [defendant's wife drowned in bathtub; court held instruction on assisted suicide statute as alternative to murder was proper because "jury might have found . . . that defendant's participation in his wife's death, if he did

---

5        In *Ryan N.,* the defendant's friend said she wanted to kill herself. She "suggested ingesting something 'like possibly sleeping pills,' " and the defendant " 'said that that would probably be a painless way.' " (*Ryan N., supra,* 92 Cal.App.4th at p. 1367.) They drove to a drugstore, where she stole a bottle of 50 Nytol pills and defendant purchased a second bottle of the same product. They returned to the car, where the defendant combined the two bottles of pills in one container and handed it to her. As they drove around, she began taking the pills one at a time. The defendant said, " 'Hurry up and take them all quickly, otherwise it won't work.' " (*Id.* at p. 1368.) She ingested the remainder of the pills and later woke up in an intensive care unit. (*Ibid.*) The court held this evidence was sufficient to support a finding the defendant guilty of an *attempt* to violate section 401, citing section 21a, which provides: "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (*Ryan N.,* at p. 1384.)

9

participate, consisted only of running the water into the bathtub and helping her to get into it"].)

In *In re Joseph G.* (1983) 34 Cal.3d 429, 431, the court held that when "a genuine suicide pact was partially fulfilled by driving a car over a cliff," the conduct of the driver, who survived, did not constitute murder and fell "more properly within the statutory definition of [section 401]." The defendant supplied the instrumentality of his passenger's death by driving the car over the cliff. (*Id.* at p. 439; see *People v. Lam* (2010) 184 Cal.App.4th 580, 584; *McCollum v. CBS, Inc.* (1988) 202 Cal.App.3d 989, 1007; *Bouvia v. Superior Court* (1986) 179 Cal.App.3d 1127, 1145.)

Defendants contend section 401 unambiguously applies to physicians providing aid-in-dying. We agree that the term "[e]very person" in section 401 necessarily applies to physicians. The term "every person" in a statute "applies to all persons." (*People v. Gangemi* (1993) 13 Cal.App.4th 1790, 1795.) We also conclude the term "aids" in section 401 is broad enough to apply to physicians furnishing a means of suicide. We believe prescribing a lethal dose of drugs to a terminally ill patient with the knowledge the patient may use it to end his or her life goes beyond the mere giving of advice and encouragement and falls under the category of direct aiding and abetting. Plaintiffs have cited *no* authority for the proposition that furnishing the means of death—whatever the means are—is not direct aiding.

Plaintiffs assert prescribing a lethal dose of drugs is not "aid" within the meaning of section 401 because the physician is unaware of whether the patient will actually have the prescription filled or take the drugs. Plaintiffs submit that "the physician just makes it

10

possible for the patient to obtain the medication *from someone else*," a pharmacist, and thus the "physician's assistance is *indirect*, not direct." We are unpersuaded. In support of this theory, plaintiffs rely on *Baxter v. State* (2009) 354 Mont. 234 [224 P.3d 1211]. In *Baxter,* a statute provided "that a person commits the offense of deliberate homicide if 'the person purposely or knowingly causes the death of another human being ' " (*id.* at p. 1215), and another statute "establishe[d] consent as a defense, stating the 'consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense.' " (*Ibid.*) *Baxter* held if the state prosecuted a physician for providing aid-in-dying to a terminally ill patient, "the physician may be shielded from liability pursuant to the consent statute." (*Ibid.*)

Plaintiffs isolate language from *Baxter* they deem helpful, such as "a physician who aids a terminally ill patient in dying is not directly involved in the final decision or the final act." (*Baxter v. State, supra,* 224 P.3d at p. 1217.) That language, however, appears in the context of a discussion on whether physician aid-in-dying fell within an exception to the consent statute for conduct that " 'is against public policy . . . even though consented to.' " (*Id.* at p. 1215.) *Baxter* noted a "survey of courts that have considered this issue yields unanimous understanding that consent is rendered ineffective as 'against public policy' in assault cases characterized by aggressive and combative acts that breach public peace and physically endanger others." (*Id.* at p. 1216.) *Baxter* concluded physician aid-in-dying does not violate public policy because "[e]ach stage of the physician-patient interaction is private, civil, and compassionate." (*Id.* at p. 1217.) *Baxter* did not interpret a statute similar to section 401 or suggest prescribing a lethal

11

dose of drugs does not constitute furnishing the means of suicide. "An appellate decision is not authority for everything said in the . . . opinion but only 'for the points actually involved and actually decided.' " (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

We agree with the trial court's finding that "[w]riting a prescription is direct participation" for purposes of section 401. A prescription for a lethal dose of drugs is instrumental in accomplishing a patient's suicide, and thus the act of prescribing is " 'active and intentional participation in the events leading to the suicide.' " (*Ryan N., supra,* 92 Cal.App.4th at p. 1374.)

B

For the first time on appeal, plaintiffs assert the plain terms of section 401 do not control because the statute is *latently* ambiguous in light of its legislative history. They submit the legislative history shows the Legislature never intended to criminalize the furnishing of the means of suicide for anyone, let alone physicians.

A statute is ambiguous when it is susceptible to more than one interpretation. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1495.) A statute may be ambiguous on its face or latently ambiguous. (*Ibid.*) "A latent ambiguity exists where ' "some extrinsic evidence creates a *necessity* for interpretation or a choice among two or more *possible meanings.*" [Citation.]' [Citation.] Such a necessity is present where a literal construction would frustrate rather than promote the purpose of the statute." (*Ibid.*)

Defendants object to plaintiffs' latent ambiguity argument on the ground of waiver. " 'As a general rule, failure to raise a point in the trial court constitutes [a] waiver . . . .' " (*In re Marriage of Priem* (2013) 214 Cal.App.4th 505, 510.) We have discretion,

12

however, to address a pure question of law raised for the first time on appeal. (*Id.* at p. 511.) The interpretation of a statute raises a pure question of law (*Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1100), and we consider plaintiffs' position.

In 1870, a new Code Commission was appointed to codify the laws of California because "there was a continuous and mounting dissatisfaction with the condition of our statute law." (Kleps, *The Revision and Codification of California Statutes 1849-1953* (1954) 42 Cal. L.Rev. 766, 771 (hereafter Kleps)). Based on the Code Commission's work, in 1872 the Legislature adopted a new Penal Code, the provisions of which were generally effective in 1873. (Kleps, *supra,* at pp. 773-777.)[6]

"The immediate progenitor of the California Penal Code was the Field Penal Code in New York, drafts of which were produced in 1864 and 1865." (Mounts, *Malice Aforethought in California: A History of Legislative Abdication and Judicial Vacillation* (1999) 33 U.S.F. L.Rev. 313, 321, fn. omitted.) "The Field Penal Code dealt with suicide in some detail." (Marzen et al., *Suicide: A Constitutional Right?"* (1985) 24 Duq. L.Rev. 1, 76.) Concerning assisted suicide, section 230 of the draft Field Penal Code provided at page 80: "Every person who willfully, in any manner, *advises, encourages, abets or assists* another person in taking his own life, is guilty of aiding suicide." Section 231 of the draft Field Penal Code provided at page 80: "Every person who willfully *furnishes another person with any deadly weapon or poisonous drug*, knowing that such person

---

6    The Legislature adopted amendments to the codes in its 1873-1874 session. (Kleps, *supra,* 42 Cal. L.Rev. at p. 778.)

13

intends to use such weapon or drug in taking his own life, is guilty of aiding suicide, if such person thereafter employs such instrument or drug in taking his own life." (Italics added.)

Plaintiffs assert the drafters of the Field Penal Code recognized that the "advises, encourages, abets or assists" language of draft Field Penal Code section 230 was not broad enough to criminalize furnishing the means of death, and thus a separate statute, draft Field Penal Code section 231, was required to accomplish that goal. Plaintiffs reason that because California's section 401 uses the terms "aids, or advises, or encourages," which are similar to those used in draft Field Penal Code section 230, the Code Commission intended that section 401 not apply to furnishing the means of suicide.

We disagree with plaintiffs' analysis. We believe it likely that the Code Commission recognized the term "aids" in section 401 is broad enough to cover furnishing the means of suicide, and thus an additional statute would be superfluous. The Code Commission was not required to propose redundancies. Kleps observes the Code Commission sought to simplify matters and give "only one expression of a particular rule" (Kleps, *supra,* 42 Cal. L.Rev. at p. 778, fn. 45), and "[n]o *direction* to 'codify' the laws of the state along the lines of Field's New York work can be read into [the] statute" authorizing the code commission's work. (*Id.* at p. 773, italics added.)[7]

---

7    The Legislature authorized the Code Commission to revise all the statutes of the state " 'and correct verbal errors and omissions, and suggest such improvements as will introduce precision and clearness into the wording of the statutes' "; " 'to recommend all such enactments as shall . . . be necessary to supply the defects of and give completeness to the existing legislation of the State' "; and " 'to arrange the statutes in the most

14

Plaintiffs assert:  "It seems that, in the Code Commission's view, Field Penal Code section 231 'did not stand the test of examination,' " and thus it did not intend to criminalize the furnishing of the means of suicide.  Plaintiffs, however, concede:  "We can do no more than surmise this, because '[v]ery little record remains of the internal functioning of the 1870-74 Code Commission . . . ."  (Quoting Kleps, *supra,* 42 Cal. L.Rev. at p. 773.)  Conjecture and speculation are not proper bases for statutory interpretation.  (*People v. Barker* (2004) 34 Cal.4th 345, 356; *Veguez v. Governing Bd. of the Long Beach Unified School Dist.* (2005) 127 Cal.App.4th 406, 420, fn. 9.)

Further, the Legislature's conduct after the enactment of section 401 indicates the statute is intended to criminalize furnishing the means of suicide.  California courts have consistently construed section 401 in that manner, and the Legislature has never offered any clarification to the contrary.  (*People v. Matlock, supra,* 51 Cal.2d at p. 694; *In re Joseph G., supra,* 34 Cal.3d at pp. 431, 439; *Ryan N., supra,* 92 Cal.App.4th at p. 1383; *People v. Lam, supra,* 184 Cal.App.4th at p. 584; *McCollum v. CBS, Inc., supra,* 202 Cal.App.3d at p. 1007; *Bouvia v. Superior Court, supra,* 179 Cal.App.3d at p. 1145.)  "To alter the judicial interpretation of a statute the Legislature must alter the statute."  (*Sharpe v. Superior Court* (1983) 143 Cal.App.3d 469, 474.)  "Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must

systematic and convenient form, and furnish a complete and alphabetical list of the matters contained therein . . . .' "  (Kleps, *supra,* 42 Cal. L.Rev. at pp. 772-773.)

15

be presumed that the Legislature is aware of the judicial construction and approves of it."

(*People v. Hallner* (1954) 43 Cal.2d 715, 719.)[8]

Additionally, in 1999 the Legislature enacted the Health Care Decisions Law (Prob. Code, § 4600 et seq.). The measure, effective in 2000, "recognizes that an adult has the fundamental right to control the decisions relating to his or her own health care, including the decision to have life-sustaining treatment withheld or withdrawn." (Prob. Code, § 4650, subd. (a).) The measure expressly permits patients to direct providers to "withhold, or withdraw artificial nutrition and hydration and all other forms of health care, including cardiopulmonary resuscitation." (Prob. Code, § 4617, subd. (c).) Probate Code section 4653 cautions: "Nothing in this division shall be construed to condone, authorize, or approve mercy killing, *assisted suicide*, or euthanasia. This division is *not intended to permit any affirmative or deliberate act or omission to end life other than withholding or withdrawing health care* . . . so as to permit the natural process of dying." (Italics added.) A "postenactment legislative statement, though not binding, is a 'secondarily authoritative expression of expert opinion' " on legislative intent. (*People v.*

---

8 Plaintiffs assert we should reject this rule of statutory construction, quoting *Central Bank v. Superior Court* (1973) 30 Cal.App.3d 962, 971, footnote 12, as follows: " 'It is ironic that an unsound interpretation of a statute should gain strength merely because it has stood unnoticed by the legislature. It is a mighty assumption that legislative silence means applause. It is much more likely to mean ignorance or indifference.' " (Quoting Traynor, *Symposium on Law Reform, The Courts: Interweavers in the Reformation of Law* (Can. 1967) 32 Sask. L.R. 201, 211.) Plaintiffs also cite Witkin, which states the "notion of an alert and omnipresent legislative watchdog is pure fantasy." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 517, p. 585.) We need not dwell on these unflattering views. Assisted suicide is a controversial topic, and thus we may reasonably presume the Legislature is well aware of decisions on the issue.

16

*Preller* (1997) 54 Cal.App.4th 93, 98; *Eu v. Chacon* (1976) 16 Cal.3d 465, 470.)  " 'While "subsequent legislation interpreting [a] statute . . . [cannot] change the meaning [of the earlier enactment,] it [does] suppl[y] an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted."  [Citation.]' "  (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 724.)

We disagree with plaintiffs' assertion that Probate Code section 4653 is merely "*neutral* on the subject of aid-in-dying."  If that were so, Probate Code section 4653 would serve no purpose.  " ' " 'An interpretation that renders related provisions nugatory must be avoided . . . .' " ' "  (*United Health Centers of San Joaquin Valley, Inc. v Superior Court* (2014) 229 Cal.App.4th 63, 80.)

Perhaps most telling, for two decades the Legislature has intermittently attempted to legalize physician aid-in-dying.  (Assem. Bill No. 1080 (1995-1996 Reg. Sess.) [The Death With Dignity Act]; Assem. Bill No. 1310 (1995-1995 Reg. Sess.) [same]; Assem. Bill No. 1592 (1999-2000 Reg. Sess.) [same]; Assem. Bill No. 654 (2005-2006 Reg. Sess. [California Compassionate Choices Act]); Assem. Bill No. 651 (2005-2006 Reg. Sess. [same]); Assem. Bill No. 374 (2007-2008 Reg. Sess.) [same]; and Sen. Bill No. 128 (2015-2016 Reg. Sess.) [same]; see Prop. 161 (1992) [California voters rejected physician-assisted death initiative].)[9]  For Assembly Bill No. 651, the Senate Judiciary

---

[9]    We grant the unopposed request of District Attorney Lacey that we take judicial notice of these bills and this initiative.

Committee specifically identified section 401 as existing law proscribing physician aid-in-dying.  (Sen. Judiciary Com., analysis of Assem. Bill No. 651 (2005-2006 Reg. Sess.) p. 5.) For Assembly Bill 15, the Senate Rules Committee noted existing law "[m]akes it a felony to deliberately aid, or advise, or encourage another to commit suicide," which is the language of section 401.  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 15, as amended Sept. 3, 2015, p. 2.)  These multiple attempts and the recently enacted End of Life Option Act (Assem. Bill 15) demonstrate the Legislature's acknowledgment that section 401 currently criminalizes the furnishing of the means of suicide.  " 'Under the rules governing statutory construction, when the Legislature enacts an amendment [or new statute on the issue], we presume it that this " 'indicates that it thereby intended to change the original act by creating a new right or withdrawing an existing one.' "  [Citation.]' "  (*City of Irvine v. Southern California Assn. of Governments* (2009) 175 Cal.App.4th 506, 522.)

We conclude the legislative history of section 401 does not support plaintiffs' position, and under the statute's plain terms it proscribes furnishing the means of suicide.[10]  " 'We have no general power to rewrite statutes to conform to some

---

[10]    We disagree with plaintiffs' assertion the rule of lenity should apply.  " 'That rule generally requires that "ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation.  But . . . 'that rule applies "only if two reasonable interpretations of the statute stand in relative equipoise." [Citation.]' [Citations.]" [Citations.]' [Citation.]  'The rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute.  [Citation.]  Rather, the rule applies " 'only if the court can do no more than guess what the legislative body intended; there must be an *egregious*

underlying "policy." As a rule, there can be no intent in a statute not expressed in its words . . . .' " (*In re San Diego Commerce* (1995) 40 Cal.App.4th 1229.)

II

*"As Applied" Constitutional Challenge*

A

Alternatively, plaintiffs contend section 401—"as applied" to any physician who may prescribe a lethal dose of drugs to a terminally ill patient competent to make medical decisions—violates the patient's state constitutional right of autonomy privacy.[11] This contention also presents an issue of first impression.

"The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity." (*People v. Falsetta* (1999) 21 Cal.4th 903, 912-913.) The party arguing unconstitutionality has the burden of proof. (*In re York* (1995) 9 Cal.4th 1133, 1152.)

"An as applied [constitutional] challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute . . . in the allegedly impermissible

ambiguity and uncertainty to justify invoking the rule.' " [Citation.]' " (*People v. Nuckles* (2013) 56 Cal.4th 601, 611.) Such is not the case here.

[11] Plaintiffs have abandoned their arguments at the trial court that section 401 also violates their state constitutional rights to liberty, free speech, and equal protection.

manner it is shown to have been applied in the past.  It contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute . . . has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right."  (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)  "If a plaintiff seeks to enjoin future, allegedly impermissible, types of application of a facially valid statute or ordinance, the plaintiff must demonstrate that such application is occurring or has occurred in the past."  (*Ibid.*)

B

Article I, section 1 of the California Constitution provides:  "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*."  (Italics added.)  "The phrase 'and privacy' was added . . . by an initiative adopted by the voters on November 7, 1972 (the Privacy Initiative. . .)."  (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 15 (*Hill*).)

We must interpret and apply the Privacy Initiative in a manner consistent with the probable intent of the voters of California.  (*Legislature v. Eu* (1991) 54 Cal.3d 492, 505.)  "When, as here, the language of an initiative measure does not point to a definitive resolution of a question of interpretation, ' "it is appropriate to consider indicia of the voters' intent other than the language of the provision itself." . . .  Such indicia include the analysis and arguments contained in the official ballot pamphlet.' "  (*Hill, supra,* 7 Cal.4th at p. 16.)

20

The official ballot pamphlet of the Privacy Initiative indicates voters were concerned about "information-amassing practices of both 'government' and 'business.' " (*Hill, supra,* 7 Cal.4th at pp. 16-17.)  The argument for the initiative "emphasized the capacity of both governmental and nongovernmental agencies to gather, keep, and disseminate sensitive personal information without checking its accuracy or restricting its use to mutually agreed or otherwise legitimate purposes." (*Id.* at p. 17.)  A "reasonable voter would most likely have concluded he or she was casting a ballot to safeguard his or her personal privacy against private as well as government entities." (*Id.* at p. 20, fn. omitted.)

However, "[a]utonomy privacy is also a concern of the Privacy Initiative.  The ballot arguments refer to the *federal constitutional tradition* of safeguarding certain intimate and personal decisions from government interference in the form of penal and regulatory laws.  [Citation.]  But they do not purport to create any unbridled right of personal freedom of action that may be vindicated in lawsuits against either government agencies or private persons or entities.  [¶]  Whether established social norms safeguard a particular type of information or protect a specific personal decision from public or private intervention is to be determined from the usual sources of positive law governing the right to privacy—common law development, constitutional development, statutory enactment, and the ballot arguments accompanying the Privacy Initiative." (*Hill, supra,* 7 Cal.4th at p. 36, italics added.)

Plaintiffs point out that under California Supreme Court authority interpreting the constitutional right of privacy, a person has a "fundamental right of self-determination" to

21

refuse or have terminated any type of medical treatment, even when doing so "will cause or hasten death." (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 732.) This "preeminent deference derives principally from 'the long-standing importance in our Anglo-American legal tradition of personal autonomy and the right of self-determination.' " (*Id.* at p. 734.) Further, "the interest in autonomy privacy protected by the California constitutional privacy clause includes a pregnant woman's right to choose whether or not to continue her pregnancy." (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 332.) This "right to choose . . . implicates a woman's fundamental interest in the preservation of her personal health (and in some instances the preservation of her life), her interest in retaining personal control over the integrity of her own body, and her interest in deciding for herself whether to parent a child." (*Ibid.*, fns. omitted.)

Here, the trial court relied on *Donaldson, supra,* 2 Cal.App.4th 1614, and we also find the opinion instructive despite significant factual distinctions. In *Donaldson,* plaintiff Donaldson had an inoperable brain tumor and an estimated life expectancy of five years from the date of diagnosis. He wanted "to be cryogenically suspended, premortem, with the assistance of [plaintiff] Mondragon and others. This procedure would freeze Donaldson's body to be later reanimated when curative treatment exist[ed] for his brain cancer. Following cryogenic suspension, Donaldson [would] suffer irreversible cessation of circulatory and respiratory function and irreversible cessation of all brain function. [¶] He [would] be dead according to the definition of death" under California law. (*Id.* at p. 1618.)

22

Donaldson sought a judicial declaration he had a constitutional privacy right to fulfill his plan with the aid of third parties. He wanted Mondragon to " 'advise and encourage' " him " 'to minimize the time between his legal death and the onset of the cryogenic suspension process.' " (*Donaldson, supra,* 2 Cal.App.4th at p. 1618.) "Recognizing that Mondragon [would] be committing a homicide, or alternatively, aiding and advising a suicide, Donaldson and Mondragon [sought] an injunction protecting Mondragon from criminal prosecution." (*Id.* at pp. 1618-1619.)

*Donaldson* affirmed the sustaining of defendants' demurrer to the complaint without leave to amend. (*Donaldson, supra,* 2 Cal.App.4th at pp. 1619, 1625.) As do plaintiffs here, Donaldson relied on opinions pertaining to a patient's right to refuse medical treatment. Donaldson explains: "*It is one thing to take one's own life, but quite another to allow a third person assisting in that suicide to be immune from investigation by the coroner or law enforcement agencies.* [¶] In such a case, the state has a legitimate compelling interest in protecting society against abuses. This interest is more significant than merely the abstract interest in preserving life no matter what the quality of that life is. Instead, it is the interest of the state to maintain social order through enforcement of the criminal law and to protect the lives of those who wish to live no matter what their circumstances. This interest overrides any interest Donaldson possesse[d] in ending his life through the assistance of a third person in violation of the state's penal laws. *We cannot expand the nature of Donaldson's right of privacy to provide* a *protective shield for third persons who end his life*." (*Id.* at p. 1622, italics added.) The court added that "[i]n the case of assisted suicides, . . . the state has an important interest to ensure that

23

people are not influenced to kill themselves. The state's interest must prevail over the individual because of the difficulty, if not the impossibility, of evaluating the motives of the assister or determining the presence of undue influence." (*Id.* at p. 1623; *Thor v. Superior Court, supra,* 5 Cal.4th at p. 744 [citing *Donaldson* for proposition there is "criminal liability for assisting suicide"].)

In addition to *Donaldson,* the trial court here relied on *Glucksberg, supra,* 521 U.S. 702, in which the United States Supreme Court rejected the contention that as applied to physician aid-in-dying, Washington state's ban on suicide violated the liberty interest protected by the due process clause of the Fourteenth Amendment to the federal Constitution.[12] (*Glucksberg, supra,* 521 U.S. at p. 735.) The court inquired whether "this asserted right has any place in our Nation's traditions" (*id.* at p. 723), and answered it in the negative, noting: "We are confronted with a consistent and almost universal tradition that has long rejected the asserted right, and continues explicitly to reject it today, even for terminally ill, mentally competent adults. *To hold for respondents, we would have to reverse centuries of legal doctrine and practice, and strike down the considered policy choice of almost every State.*" (*Id.* at p. 723, italics added.)

The court concluded Washington's suicide ban was rationally related to legitimate government interests, including an " 'unqualified interest in the preservation of human life' " (*Glucksberg, supra,* 521 U.S. at p. 728), interests in "protecting the integrity and

---

12    Washington is now one of the few states legislatively legalizing physician aid-in-dying. (Wash. Rev. Code Ann. § 70.245.10 et seq. (2009); see Or. Rev. Stat. Ann. § 127.800 et seq. (1995); Vt. Stat. Ann., title 18, § 5281 et seq. (2013).)

24

ethics of the medical profession" (*id.* at p. 731), "protecting vulnerable groups—including the poor" (*ibid.*), and the "fear that permitting assisted suicide will start it down the path to voluntary and perhaps even involuntary euthanasia." (*Id.* at p. 732.) *Glucksberg* noted: "Throughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide. Our holding permits this debate to continue, as it should in a democratic society." (*Id.* at p. 735.)

Further, the trial court here relied on *Vacco, supra,* 521 U.S. 793, in which the United States Supreme Court rejected the contention that as applied to physician aid-in-dying, New York statutes banning assisted suicide violates the equal protection clause of the Fourteenth Amendment. Plaintiffs' theory was that for terminally ill patients the refusal of medical treatment and physician-aid-in-dying are essentially the same, and the legality of the former and illegality of the latter constitutes differential treatment. (*Id.* at pp. 797-798.) The court concluded the statutes "affect and address matters of profound significance to all New Yorkers alike" (*id.* at p. 799), and thus they "neither infringe fundamental rights nor involve suspect classifications" and are "entitled to a 'strong presumption of validity.' " (*Id.* at p. 800.)

The court disagreed that refusing or ending medical treatment, which may hasten death, " 'is nothing more nor less than assisted suicide.' " (*Vacco, supra,* 521 U.S. at p. 800.) Rather, "the distinction between assisting suicide and withdrawing life-sustaining treatment, a distinction widely recognized and endorsed in the medical profession and in our legal traditions, is both important and logical; it is certainly

25

rational." (*Id.* at pp. 800-801, fn. omitted.) "The distinction comports with fundamental legal principles of causation and intent. . . . [W]hen a patient refuses life-sustaining medical treatment, he dies from an underlying fatal disease or pathology; but if a patient ingests lethal medication prescribed by a physician, he is killed by that medication." (*Id.* at p. 801.)

Plaintiffs assert we should not rely on *Glucksberg* or *Vacco* because they pertain to federal constitutional rights, and our state Constitution provides greater privacy protection. "[N]ot only is the state constitutional right of privacy embodied in explicit constitutional language not present in the federal Constitution, but past California cases establish that, in many contexts, the scope and application of the state constitutional right of privacy is broader and more protective of privacy than the federal constitutional right of privacy as interpreted by the federal courts." (*American Academy of Pediatrics v. Lungren,* (1997) 16 Cal.4th 307, 326.) Plaintiffs, however, do not specify how the scope of the state constitutional right of privacy is broader than the federal right *in this particular circumstance.* They do not parse out why the reasoning of *Glucksberg* or *Vacco* is ostensibly inapplicable.

Further, plaintiffs cite no authority for the proposition we must ignore federal opinions on an important issue of public policy, and we decline to do so in this case, particularly because the *autonomy* privacy interest under the California Constitution derives from federal law. (*Hill, supra,* 7 Cal.4th at pp. 35-36.) Additionally, we may give even dicta persuasive weight when "it demonstrates a thorough analysis of the issue

26

or reflects compelling logic."  (*Smith v. County of Los Angeles* (1989) 214 Cal.App.3d 266, 297.)

Plaintiffs assert terminally ill patients have an autonomy privacy interest in having assistance in committing suicide, and thus the state must have a compelling interest in enforcing section 401 against physicians in such circumstances.  We disagree.  In *Hill, supra,* 7 Cal.4th at pages 34 to 35, the court declined "to hold that every assertion of a privacy interest under article I, section 1 must be overcome by a 'compelling interest.' " The "particular context, i.e., the specific kind of privacy interest involved and the nature and seriousness of the invasion and *any countervailing interests*, remains the critical factor in the analysis.  Where the case involves an obvious invasion of an interest fundamental to personal autonomy, e.g., freedom from involuntary sterilization or the freedom to pursue consensual familial relationships, a 'compelling interest' must be present to overcome the vital privacy interest.  If, in contrast, the privacy interest is less central, *or in bona fide dispute, general balancing tests are employed.*"  (*Id.* at p. 34, italics added, fn. omitted.)

Plaintiffs have cited no authority from any jurisdiction suggesting assistance of a third party in committing suicide is an interest fundamental to personal autonomy.  In California, the issue of whether physician aid-in-dying should be de-criminalized has been the subject of discussion for a lengthy period, and the issue remains in dispute today.  In any event, California does have compelling interests in enforcing section 401 in the context of physician-assisted suicide.  These interests are expressed in *Donaldson, Glucksberg,* and *Vacco,* and we need not repeat them here.

27

Setting aside personal views and having found no legal support for plaintiffs' position, we agree with the Attorney General that the controversial issue of physician aid-in-dying is for the Legislature. We also agree Assembly Bill 15 "demonstrates the Legislature's view that, if an exception for physician assistance is allowed, it must be accompanied by specific, detailed safeguards that are not present in [plaintiffs'] proposed construction" of section 401. To that end, the End of Life Option Act provides for the addition of 24 statutes to the Health and Safety Code. (Assem. Bill 15, § 1.)[13] If the law were changed by judicial opinion, these extensive safeguards would not be in place. (See *Carroll v. Interstate Brands Corp.* (2002) 99 Cal.App.4th 1168, 1177 ["We believe . . . the task of designing protective procedures should be left to the Legislature, and decline to impose a set of procedural rules by judicial fiat."].)

C

In their reply brief, plaintiffs attempt to assuage concerns about the absence of safeguards should we rule in their favor. They propose that we condition our ruling on

---

[13] For instance, before obtaining a prescription for a lethal dose of drugs a terminally ill patient must submit two oral requests to his or her physician, a minimum of 15 days apart, and a written request that meets specified criteria, including the signatures of two witnesses. (Assem. Bill 15, § 1.) Before issuing such a prescription, a physician must adhere to numerous requirements, including determining whether the patient has the capacity to make medical decisions, whether the patient has a terminal illness, whether the request is voluntary, and whether the patient is making an informed decision. The physician must inform the patient of his or her diagnosis and prognosis, the potential risks of ingesting the drug, and feasible alternatives or additional treatment options, including comfort care, hospice care, palliative care, and pain control. (*Ibid.*) Further, Assembly Bill 15 specifies that "a qualified individual's act of self-administering an aid-in-dying drug shall not have an effect upon a life, health, or annuity policy other than that of a natural death from the underlying disease." (*Ibid.*)

their "voluntary compliance with the terms" of Assembly Bill 15 "as if it were presently in effect." They also suggest that, faced with a judicial opinion approving physician aid-in-dying, "to bridge any gap between the finality of a judgment in [their] favor and the currently delayed effective date" of Assembly Bill 15, the Legislature may make the measure effective immediately through "urgency legislation," or make it effective sooner by "promptly adjourn[ing] the current special session."

" ' " 'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief. To withhold a point until the closing brief would deprive the respondent of his opportunity to answer it or require the effort and delay of an additional brief by permission.' " ' " (*Proctor v. Vishay Intertechnology, Inc.* (2013) 213 Cal.App.4th 1258, 1273.) This " ' "should undoubtedly be the rule where no good reason appears for the omission to make the point in the opening brief . . . ." ' " (*Id.* at p. 1274.)

We note, however, that there are several problems with plaintiffs' proposal. For instance, it is not this court's province to monitor plaintiffs' postjudgment conduct. Further, our decision would have far-reaching consequences; it would not merely apply narrowly to Dr. Cederquist. Plaintiffs do not argue section 401 is unconstitutional as applied only to Dr. Cederquist, but to California physicians in general. Additionally, Dr. Cederquist's voluntary compliance with a measure that is not yet effective obviously does not protect her from potential prosecution under section 401. Indeed, that is why the parties agreed this appeal is not moot in light of Assembly Bill 15. Also, we may not reasonably presume that if we ruled in plaintiffs' favor the Legislature would immediately

make Assembly Bill 15 effective.  Perhaps the Legislature declined to enact Assembly Bill 15 as an emergency measure to give opponents the opportunity to speak up before its effective date.

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to costs on appeal.


McDONALD, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.